UNITED STATES of America,
Plaintiff–Appellee,

v.

Connie Sue HEATER, Defendant–
Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Harvey Bernard JOHN, Defendant–
Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Timothy W. McCOY, Defendant–
Appellant.

Nos. 94–5202, 94–5215 and 94–5220.

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 3, 1994.

Decided Aug. 16, 1995.

**ARGUED:** J. Michael Benninger, Wilson, Frame & Metheney, Morgantown, WV, for appellant McCoy; George F. Fordham, Clarksburg, WV, for appellant John; Thomas Roy Michael, Clarksburg, WV, for appellant Heater. Samuel G. Nazzaro, Jr., Asst. U.S. Atty., Wheeling, WV, for appellee. **ON BRIEF:** William D. Wilmoth, U.S. Atty., Wheeling, WV, for appellee.

Before ERVIN, Chief Judge, WIDENER, Circuit Judge, and PHILLIPS, Senior Circuit Judge.

Chief Judge ERVIN wrote the opinion, in which Judge WIDENER and Senior Judge PHILLIPS joined.

## OPINION

ERVIN, Chief Judge:

Timothy McCoy, leader of a West Virginia marijuana cultivation and distribution ring, and co-defendants Connie Heater and Harvey John appeal convictions for conspiracy, participation in a continuing criminal enterprise, money laundering, tax evasion, and perjury. McCoy and John additionally challenge the district court's handling of the sentencing phase of their trials. We affirm the convictions of all the defendants, except for McCoy's conspiracy conviction under 21 U.S.C. § 846, which we remand with instructions to vacate. We also affirm McCoy's and Heater's sentences, but vacate John's perjury sentence and remand for resentencing of John.

I.

West Virginia state police, in conjunction with federal agents from the Internal Revenue Service, the Drug Enforcement Agency, and the Federal Bureau of Investigation, worked for nearly four years developing a case against Timothy McCoy, Connie Heater, and other individuals who were involved in the cultivation, possession, and distribution of marijuana in Lewis County, West Virginia. State police first learned of McCoy's illegal activities in August 1988, when two officers discovered a marijuana field off of Interstate 79 in Lewis County. The field contained 2,355 plants, each of which would yield between one-half pound and two pounds of marijuana. With the marijuana worth between $1,600 and $3,000 per pound, the field's market value was estimated at three-and-one-half to four million dollars. DEA agent Lowell Maxey testified that on a scale of one to ten, the size of the marijuana field would register as a nine. The marijuana field was located very close to McCoy's home,

and his car frequently was parked near the field.

McCoy's narcotics operation extended beyond this one field, however, and state and federal authorities soon located another marijuana field in Ritchie County, West Virginia. Although this second field began with only 100 plants, by 1989 it served as McCoy's primary cultivation center. Over the next three years, McCoy cultivated approximately 3,000 plants at that site. The evidence accumulated against the defendants is substantial, and we review the intricacies of the operation in more detail below as we consider the defendants' challenges to the sufficiency of the evidence.

A federal grand jury began investigating McCoy and his co-workers in the fall of 1990 and returned a twenty-four count indictment in September of 1992. The three defendants were tried in United States District Court for the Northern District of West Virginia. McCoy, considered the kingpin of the operation, was convicted under 21 U.S.C. § 846 for conspiracy, as well as under 28 U.S.C. § 848 for engaging in a continuing criminal enterprise ("CCE") to manufacture, distribute, and possess with intent to distribute marijuana. In addition to the two drug convictions, the jury convicted McCoy on five money laundering counts, six tax evasion counts, and two counts of suborning perjury. Heater, McCoy's girlfriend and the mother of his two infant children, was found guilty on the § 846 conspiracy count, as well as one money laundering and two perjury counts. John, the least culpable of the defendants, had been indicted only on the section 846 conspiracy count and on one count of perjury. The jury found him guilty only of perjury.

McCoy was sentenced on fourteen different counts, the most significant of which was a 292–month term for the CCE conviction. The district court properly vacated a 292–month sentence for the § 846 conspiracy charge, but chose not to vacate the underlying conviction. McCoy received three additional sentences totaling 336 months for the money laundering, tax evasion, and suborning perjury convictions. The court directed that these additional prison terms would be served concurrently with the base sentence of 292 months. For her part in the drug conspiracy, money laundering, and subornation of perjury, Heater received a 188–month sentence. John received the statutory maximum 60–month sentence for having committed perjury in an effort to protect the marijuana operation.

## II.

Our review of the arguments raised by McCoy on appeal reveals no reversible error apart from the need to remand the case to the district court for the purpose of vacating McCoy's § 846 conspiracy conviction.

## A.

■ Six of the thirteen arguments raised by McCoy on appeal relate to the sufficiency of the evidence that existed to support his convictions. McCoy contends that the evidence was insufficient to sustain the jury's finding that he (1) served as an organizer, supervisor, or manager of five or more persons in the context of a continuing criminal enterprise; (2) engaged in a § 846 conspiracy; (3) conspired to launder money obtained through his marijuana sales; (4) evaded payment of taxes and filed false declarations of income; (5) laundered money; and (6) suborned perjury and intimidated and threatened witnesses. In reviewing each of these challenges to the sufficiency of the evidence, we inquire whether "*any* rational trier of fact could have found the essential elements of the crime [charged] beyond a reasonable doubt," *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), and we "construe the evidence in the light most favorable to the government, assuming its credibility, drawing all favorable inferences from it, and taking into account all the evidence, however adduced," *United States v. Giunta,* 925 F.2d 758, 764 (4th Cir.1991).

## (1)

■ Conviction for participating in a continuing criminal enterprise ("CCE") requires that the government prove four elements:

(1) defendant committed a felony violation of the federal drug laws;

(2) the violation was part of a continuing series of violations of the drug laws;

(3) the series of violations were undertaken by the defendant in concert with five or more other persons with respect to whom the defendant occupied a position of organizer, supervisor or any other position of management;

(4) the defendant obtained substantial income or resources from the continuing series of violations.

*United States v. Ricks,* 882 F.2d 885, 890–91 (4th Cir.1989), *cert. denied,* 493 U.S. 1047, 110 S.Ct. 846, 107 L.Ed.2d 841 (1990). McCoy contends there was not enough evidence proving that he occupied a supervisory position in relation to at least five other individuals. Specifically, McCoy claims that because five of his co-defendants were acquitted of conspiracy charges under Count Two of the indictment, there was no basis for convicting him of participation in a continuing criminal enterprise.

█ McCoy's claim that his acquitted co-defendants cannot be counted towards the five people needed to satisfy the third element of the *Ricks* test, is inconsistent with circuit precedent. In *United States v. Rhodes,* 779 F.2d 1019 (4th Cir.1985), *cert. denied,* 476 U.S. 1182, 106 S.Ct. 2916, 91 L.Ed.2d 545 (1986), we concluded that acquittals of some co-defendants on conspiracy charges does not prevent the jury from returning a conviction against one remaining conspirator. *Id.* at 1025; *see also United States v. Thomas,* 900 F.2d 37, 40 (4th Cir. 1990) (noting that "a defendant cannot challenge his conviction merely because it is inconsistent with a jury's verdict of acquittal on another count"). Our holdings in *Rhodes* and *Thomas* are consistent with the plain language of 21 U.S.C. § 848(c). Nothing in that provision suggests that the five people working under the accused's supervision must be convicted of an underlying conspiracy charge in order to be counted for § 848 purposes.

█ Unable to insulate himself from a CCE conviction merely because his co-defendants were not convicted on conspiracy charges, McCoy next asserts that the government failed to present sufficient evidence

that he supervised five people. As to the numerical requirement, "the Government need not prove 'that the five individuals were supervised and acted in concert at the same time, or even that [they] were collectively engaged in at least one specific offense.'" *United States v. Johnson,* 54 F.3d 1150, 1155 (4th Cir.1995) (quoting *Ricks,* 882 F.2d at 891). Even more important, for our purposes in this case, the government need not show that "the defendant ha[d] personal contact with the five persons because organizational authority and responsibility may be delegated." *United States v. Butler,* 885 F.2d 195, 200–01 (4th Cir.1989).

█ The Sixth Circuit's decision in *United States v. Ward,* 37 F.3d 243 (6th Cir.1994), cited by appellants' counsel, actually strengthens the case against McCoy. Although the *Ward* court reversed a CCE conviction on the ground that evidence of the defendant supervising more than three people did not exist, the legal principles applied in *Ward* are similar to those in *Johnson.* The Sixth Circuit ruled that "[m]ere delegation of authority does not detract from [a defendant's] ultimate status as organizer." *Id.* at 250 (quoting *United States v. Rosenthal,* 793 F.2d 1214, 1226 (11th Cir.), *modified on other grounds,* 801 F.2d 378 (11th Cir.1986), *cert. denied,* 480 U.S. 919, 107 S.Ct. 1377, 94 L.Ed.2d 692 (1987)). As a result, the existence of a multi-level hierarchy does not, in and of itself, insulate McCoy from being held accountable for all of those working below him. A person who knew about the drug operation, took orders directly from the defendant, and helped in the drug business, can be found to have been a part of the defendant's organization. *Id.* at 247.

█ When viewed in the light most favorable to the government, the evidence established at a minimum that McCoy either organized, supervised, or managed co-defendant Connie Heater and at least four others: Bobby Timms, Jerry Burkhammer, and, to a lesser degree, Bob Posey and Brad Carpenter. Timms testified that he, Posey, and Carpenter helped McCoy harvest one of the marijuana fields in 1989. McCoy paid Posey

and Carpenter in marijuana and money. They took orders from him, were paid wages by him, and also received marijuana for their services. Timms admitted to working in the marijuana fields for eight hours a day, six days a week. It was entirely reasonable for the jury to conclude that Posey, Carpenter, and Timms were three of McCoy's workers.

The jury had even more reason to believe that McCoy supervised Connie Heater and Jerry Burkhammer. McCoy's sister-in-law testified that she knew Burkhammer to be one of the people who worked in McCoy's marijuana field. Burkhammer admitted on direct examination that he worked in McCoy's fields and that McCoy controlled operations at the I–79 field. Burkhammer and others constructed an irrigation system and painted fences in order to disguise the field. McCoy purchased all the tools, paint, and fertilizer used in the fields. Essentially, Heater was McCoy's second in command. Heater, who was convicted on conspiracy charges, assisted in the laundering of drug money, drove workers to and from the fields, and distributed marijuana. Under *Ward,* one who launders drug proceeds falls within the ambit of 21 U.S.C. § 848. *Ward,* 37 F.3d at 247.

Based on this evidence, a rational trier of fact could have found beyond a reasonable doubt that McCoy was an organizer, supervisor, or manager of at least five individuals. McCoy's § 848 conviction is accordingly affirmed.

(2)

 In light of our decision to affirm McCoy's CCE conviction, we agree with McCoy that circuit precedent precludes his conviction under 21 U.S.C. § 846 from standing. *See Johnson,* 54 F.3d at 1162. Accordingly, we remand the case to the district court with instructions to vacate McCoy's § 846 conspiracy conviction.

Under *Butler,* "[a] defendant convicted under § 848 may not also be convicted for any predicate conspiracy charges proved as elements of the § 848 offense." 885 F.2d at 202. Upholding the § 846 and the § 848 convictions would punish McCoy twice for the same conduct. As we noted in *Butler,* it

was not Congress' intention to punish an individual under both of these sections. *Id.; United States v. Porter,* 821 F.2d 968, 978 (4th Cir.1987), *cert. denied,* 485 U.S. 934, 108 S.Ct. 1108, 99 L.Ed.2d 269 (1988). When a § 848 conviction is upheld on appeal, the normal course of action is to remand the § 846 conviction to the district court for vacatur. *Johnson,* 54 F.3d at 1162; *United States v. McManus,* 23 F.3d 878, 884 (4th Cir.1994).

Here, McCoy was convicted under counts one and two of the indictment for conducting a CCE in violation of § 848 and for engaging in a § 846 conspiracy, respectively. As was the case in *Johnson,* the underlying criminal activity used to support the CCE charge included appellant's violations of § 841 and § 846. *Johnson,* 54 F.3d at 1162. Because the district court vacated McCoy's sentence on the § 846 conspiracy count, the appellant was not punished twice for the same conduct. We need only take the next step and instruct the district court to vacate the conspiracy conviction itself.

(3)

 In order to support a conviction for money laundering, the government must prove that:

(1) defendant conducted a financial transaction in interstate commerce;

(2) defendant knew that the proceeds derived from an unlawful activity;

(3) the transaction involved proceeds of an unlawful activity; and

(4) the transaction was intended to conceal or disguise the nature of the proceeds or to avoid reporting.

18 U.S.C. § 1956(a)(1). McCoy contends that insufficient evidence existed to prove the second, third, and fourth elements under § 1956, yet he offers no evidence to support his claim that he had a legitimate source of income. McCoy asserts that he made as much as $30,000 annually from his body shop and that his grandmother gave him a gift of $8,500. No records were presented at trial to substantiate either of these alternative sources. Additionally, McCoy offered no explanation for why he purchased supplies for

the marijuana field in his grandmother's name or for why he listed a $35,000 piece of property he had purchased as being worth only $9,000.

The jury heard substantial evidence that McCoy and Heater conspired to launder money through the purchase of a $12,000 van.[1] McCoy and Heater paid cash for the vehicle, using $10, $20, and $50 denominations they brought to the dealership in a box. Title to the car was placed in Heater's name and, for some unexplained reason, McCoy and Heater used McCoy's father's address when signing documents. McCoy purchased a motorcycle in a similarly odd fashion, bringing $11,000 in cash to the store in a brown paper bag. The purchase of the van, regardless of whether McCoy paid $6,200 or $12,000, was only one of several questionable purchases that the government offered to support the money laundering convictions. McCoy bought a $35,000 piece of real estate, a Harley Davidson motorcycle, an ATV off-road vehicle, and a variety of other items. McCoy's purchases far exceeded his legal income, and the jury acted reasonably in convicting him on the five counts of money laundering. *See United States v. Webster*, 960 F.2d 1301 (5th Cir.) (holding that "a differential between [a drug dealer's] legiti-mate income and cash flow is sufficient for a money-laundering conviction"), *cert. denied*, —— U.S. ——, 113 S.Ct. 355, 121 L.Ed.2d 269 (1992).

(4)

The jury convicted McCoy on six different tax counts—two counts of tax evasion for 1990 and 1991 and four counts of having made false declarations on his income tax returns. McCoy's only argument on appeal is that there was insufficient evidence upon which the jury could have returned those convictions. His argument merits little consideration, and we affirm all six tax convictions.

In his brief, McCoy focuses on the testimony of his accountant, Randy Harris. All of Harris's calculations were based purely on what McCoy had told him. There was absolutely no recorded evidence of McCoy's yearly income or of the $20,000 McCoy had supposedly saved from his work in the body shop. Vera Maples testified she helped McCoy prepare his tax returns, but admitted that McCoy never gave her any documents relating to his income. McCoy's only comment to Maples about his income was that he needed to be sure to list enough income to

---

1. As part of its attempt to demonstrate that McCoy laundered his drug proceeds, the government offered evidence of substantial cash purchases made by McCoy and Heater between 1989 and 1992. The government claims that the defendants purchased a van with some of the drug money and then used the van to further their drug activities. McCoy contends that the discrepancy between a purchase price of $6,200 listed in the indictment and a price of $12,000 suggested by the government at trial constituted an unconstitutional variance and warrants reversal of his money laundering convictions.

Rule 52(a) of the Federal Rules of Criminal Procedure requires that we disregard a variance "if it does not affect substantial rights of the defendant." *United States v. Barsanti*, 943 F.2d 428, 438 (4th Cir.1991), *cert. denied*, 503 U.S. 936, 112 S.Ct. 1474, 117 L.Ed.2d 618 (1992). So long as the defendant has been informed of the charges against him and is able to present a defense without being taken by surprise by evidence offered at trial, *id.* (citing *Berger v. United States*, 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935)), there will have been no substantial infringement of rights. Furthermore, because we conclude that the variance did not cause prejudice when considered in light of the entire record, any error must be regarded as harmless. *Id.; cf. United States v. Miller*, 471 U.S. 130, 145, 105 S.Ct. 1811, 1820, 85 L.Ed.2d 99 (1985) (noting that "[t]he variance complained of added nothing new to the grand jury's indictment and constituted no broadening").

In this case, the indictment relating to the laundering of drug money was sufficiently clear despite the erroneous purchase price of the van. McCoy and Heater knew that they were being charged with money laundering with respect to the purchase of the van, and the specific amount of money they spent for the van did not change the fact that their alleged consumer purchase constituted money laundering. The price discrepancy is similar to the harmless variance in *Barsanti*, where the date of criminal activity appearing on the indictment differed from the date shown by the evidence. In *Barsanti*, as in this case, the defendants had been informed of the charges against them. Evidence at trial demonstrates that the government did not become aware of the $12,000 price until immediately before trial. Importantly, the defendants never suggest that the government purposely withheld the $12,000 price once it had learned of it during preparation of one of its witnesses.

cover his expenses. With regard to the counts of false declarations, records of consumer sales tax returns failed to substantiate McCoy's claim that he had earned in excess of $20,000 per year from his work at his body shop. No more than $2,469 in gross receipts were found for the period from 1988–1992. In light of the substantial purchases McCoy made on a virtually nonexistent income, a rational trier of fact could have concluded that McCoy had committed serious tax violations.

### (5)

▇▇▇▇ Subornation of perjury consists of procuring or instigating another to commit the crime of perjury. McCoy argues that there was insufficient evidence upon which a conviction for subornation of perjury could be based. More than enough evidence existed, however, to lead a rational trier of fact to the conclusion that McCoy had coerced both Jerry Burkhammer and Mary McCoy, McCoy's sister, into perjuring themselves in front of the grand jury.

Burkhammer testified that after receiving a subpoena to appear before a grand jury, McCoy told him not to say anything about marijuana and not to say anything at all because "there was [sic] too many people involved." Burkhammer further stated that he had lied on the stand during grand jury proceedings, because he was scared of what might happen to him if he told the truth. Toni Burkhammer, Jerry's wife, also testified that McCoy continually asked those persons who were going to be appearing before the grand jury to say the same thing. On cross-examination, defense counsel attempted to elicit the response that McCoy had never asked anyone to lie on the stand. Unfortunately for McCoy, counsel did not get the kind of response from Ms. Burkhammer for which he had hoped:

Q: By anything that Tim [McCoy] said or did at that meeting, he didn't, in your mind he wasn't suggesting that anybody tell anything but the truth, was he?

A: No, no. In my mind what he said at my house was everybody in that room was going to get their story straight and say the same thing. That is what he said.

Q: No suggestion that anybody lie, though, just they want their stories straight?

A: Everybody was going to go and say the same thing. *Whatever they came up with, that's what everybody was going to say.*

Joint Appendix, at 395 (emphasis added).

Additionally, Mary McCoy testified that McCoy had pressured her into lying in front of the grand jury. Not only did he tell her not to say anything, but he actually suggested testimony to her—say "sure, we smoked a few joints and all that, but we didn't deal it, grow it or sell it." As if she needed any more convincing, McCoy let Mary know that "he knew how to keep people quiet."

▇▇▇▇ On appeal, McCoy emphasizes that neither Toni Burkhammer nor Mary McCoy ever claimed that McCoy had physically threatened them. Given that this court has never included actual physical coercion as an element of subornation of perjury, it was proper for the jury to return guilty verdicts on the subornation counts so long as the evidence convinced the jurors that McCoy had procured or instigated others to commit the crime of perjury. A defendant can "instigate" without making threats of physical harm. Under the deferential sufficiency of the evidence standard, these convictions must be upheld.

### B.

In addition to raising several challenges to the sufficiency of the evidence, McCoy contests his convictions and corresponding sentences on a multitude of other grounds. Our review of those complaints reveals no reversible error.

### (1)

▇▇▇▇ Neither of McCoy's attacks on the district court's evidentiary rulings merit reversal of his convictions, particularly in light of our review of district courts' evidentiary rulings only for an abuse of discretion. *United States v. Russell,* 971 F.2d 1098, 1104

(4th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1013, 122 L.Ed.2d 161 (1993). McCoy first claims that the district court's admission of testimony linking him to Ronald Jarvis' marijuana patch violated Federal Rule of Evidence 403. *See* FED.R. EVID. 403 (relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice). This court defers to the balancing engaged in by the district court "unless it is an arbitrary or irrational exercise of discretion." *Garraghty v. Jordan,* 830 F.2d 1295, 1298 (4th Cir.1987). Testimony linking McCoy to Jarvis' patch, while damaging, was not unduly prejudicial. We find that it was not an abuse of discretion for the district court to conclude that the probative value of the testimony outweighed any prejudicial effect. "Unfair prejudice" does not include within its purview the damage done to a defendant's case which arises from the "legitimate probative force of the evidence." CHARLES A. WRIGHT & KENNETH W. GRAHAM, FEDERAL PRACTICE & PROCEDURE, § 5215, at 275 (1978). Here, Jerry Burkhammer testified that he and McCoy cultivated Jarvis' field, and Robert Bailey testified that McCoy's dozer, dump truck, and other equipment were usually located at the Jarvis field.

 McCoy also contests the district court's refusal to allow him to define the scope of the government's cross-examination of a potential defense witness, Phil Jamison. Because Jamison was facing a perjury count in a separate trial, McCoy sought to prevent the government from asking any questions as to that matter. McCoy wanted Jamison to take the stand for the sole purpose of attacking the credibility of one of the government's witnesses, Bobby Timms. "The defendant's right to present witnesses in his own defense, however, does not carry with it the right to immunize the witness from reasonable and appropriate cross-examination." *Lawson v. Murray,* 837 F.2d 653, 655 (4th Cir.), *cert. denied,* 488 U.S. 831, 109 S.Ct. 87, 102 L.Ed.2d 63 (1988). This court has always considered cross-examination to be "an indispensable tool in the search for truth," *id.* at 656, and the Fifth Amendment cannot be used selectively to provide a witness with immunity from cross-examination. McCoy ignores our ruling in *Lawson.* The district court's evidentiary rulings do not constitute an abuse of discretion.

### (2)

 McCoy and Heater each assert that they were denied fair trials and due process of law based on the district court's failure to consider their allegations of improper contact between one of the jurors and the defendants. This court recognizes "the dangers to impartiality posed by unauthorized communications between third parties and members of the jury." *Stockton v. Commonwealth of Virginia,* 852 F.2d 740, 743 (4th Cir.1988), *cert. denied,* 489 U.S. 1071, 109 S.Ct. 1354, 103 L.Ed.2d 822 (1989). This concern with improper jury contact does not mean, however, that any suggestion of improper contact automatically translates into a new trial for the defendant. In *Stockton,* we emphasized that the defendant bears the initial burden of demonstrating that an improper contact occurred. *Id.* Only if such a contact is established must the government demonstrate the absence of prejudice. *Id.*

 Here, defense counsel's declaration of improper jury contact was nothing more than a bald assertion. While the allegations raised by appellants were very serious, they were insufficient from an evidentiary perspective. McCoy's counsel could not provide any concrete evidence of improper contact. At the very least, counsel should have offered an affidavit substantiating the claim of improper contact. Although we do not question counsel's sincerity, we agree with the district court that it is not advisable to go on a "fishing expedition based [merely] on proffers." Joint Appendix, at 2216; *see also id.* at 2219 (district court expressing concern that "[t]he way in which [the improper contact issue has] been brought before me I find to be very, very inadequate from an evidentiary perspective"). It is simply not enough for defense counsel to conclude that "no officer of the Court would suggest such a contact unless they had good faith belief that the contact occurred." Appellants' Br., at 38.

 A mere proffer without further support is not enough to create a question about

improper jury tampering. Although appellants still have the option of renewing this challenge on collateral attack, for purposes of this direct appeal, we find that McCoy and Heater did not satisfy their burden under *Stockton.*

### (3)

With regard to the standard of proof to be applied in sentencing, this court has reasoned that "because the quantity of drugs goes to the question of the sentence rather than guilt, the government need only prove the quantity by a preponderance of the evidence." *United States v. Engleman,* 916 F.2d 182, 184 (4th Cir.1990). In contrast, McCoy implies that the government must prove the number of plants beyond a reasonable doubt. The quantity of plants, however, was a statutory sentencing factor rather than a substantive element of the offense. *See* U.S.S.G. § 2D1.1. Moreover, when the amount of drugs attributable to a defendant is disputed, the district court must make an independent resolution of the factual issue at sentencing. *United States v. Gilliam,* 987 F.2d 1009, 1013 (4th Cir.1993).

The commentary to section 2D1.1 of the Sentencing Guidelines provides that if an offense involves fifty or more marijuana plants, each plant shall be treated for sentencing purposes as the equivalent of one kilogram of marijuana. U.S.S.G. § 2D1.1(c), Background Commentary (Nov.1993). McCoy claims that the one plant/one kilogram ratio should not be applied, however, to marijuana plants that already have been har-

vested. In *United States v. Underwood,* 970 F.2d 1336 (4th Cir.1992), this circuit recognized that "[a]ll six courts of appeals that have confronted the issue have rejected a constitutional challenge to the one plant/one kilogram equivalence." *Id.* at 1339 (citing *United States v. Smith,* 961 F.2d 1389 (8th Cir.1992); *United States v. Holmes,* 961 F.2d 599 (6th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 232, 121 L.Ed.2d 168 (1992); *United States v. Lee,* 957 F.2d 778 (10th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 475, 121 L.Ed.2d 381 (1992); *United States v. Belden,* 957 F.2d 671 (9th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 234, 121 L.Ed.2d 169 (1992); *United States v. Osburn,* 955 F.2d 1500 (11th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 290, 121 L.Ed.2d 215 (1992); *United States v. Webb,* 945 F.2d 967 (7th Cir.1991), *cert. denied,* 502 U.S. 1116, 112 S.Ct. 1228, 117 L.Ed.2d 463 (1992)). The *Underwood* court observed that "Congress, in order to further its objective that growers be punished more severely than mere distributors, could rationally create an irrebuttable presumption that each marijuana plant be treated as the equivalent of a kilogram of marijuana, even though an average plant might produce less than that amount." *Id.* at 1339–40; *accord United States v. Wegner,* 46 F.3d 924, 926 (9th Cir.1995). In *Underwood,* we joined our sister circuits in upholding the one plant/one kilogram equivalence. We did not need to address the additional question of whether the one-to-one ratio applies regardless of whether the marijuana plants are live or already harvested.[2]

---

**2.** Since our decision in *Underwood,* a split has developed in the circuits as to whether a distinction should be made between live plants and harvested ones for sentencing purposes. McCoy asks that we adopt the position taken by the Second, Sixth, and Eleventh Circuits and find that the stepped-up equivalency of one kilogram for every marijuana plant applies to live, but not harvested, plants. *See United States v. Shields,* 49 F.3d 707, 711–12 (11th Cir.1995) (citing Sixth Circuit's decision in support of proposition that "harvested root systems are not marijuana plants for sentencing purposes" and concluding that marijuana growers should not be punished on one plant/one kilogram basis when those plants cease to exist); *United States v. Stevens,* 25 F.3d 318, 321, 323 (6th Cir.1994) (raising concern that one plant/one kilogram equivalency "metes out a punishment that is usually much greater

than that given for the consumable marijuana those plants produce" and remanding for resentencing based on total *weight* of marijuana defendant conspired to sell); *United States v. Blume,* 967 F.2d 45, 49 (2nd Cir.1992) (finding that "intent of the guidelines was 'to measure live marijuana by the number of plants and dry leaf marijuana by weight' ") (quoting *United States v. DeLeon,* 955 F.2d 1346, 1350 (9th Cir.1992)). For marijuana plants that have been harvested, these three circuits hold that punishment should be based only on the actual weight of the controlled substance.

Contrary to the decisions rendered by the Second, Sixth, and Eleventh Circuits, the Seventh Circuit has held that the one kilogram/one plant equivalency should be applied both to harvested marijuana plants as well as to live plants. *United*

As a practical matter, the harvested versus non-harvested debate is of little consequence in this case. A preponderance of evidence indicates that at least 3,000 live plants were seized from McCoy's fields. Government witnesses testified that 2,355 live plants were taken from the I–79 field and 680 live plants were taken from the Jarvis field, for a total of 3,035 live plants. Approximately 1,000 harvested plants had also been seized from fields in Ritchie County.[3] None of our sister circuits challenge the one plant/one kilogram rule in the case of live plants, which means that the 3,035 live plants seized from the I–79 and Jarvis fields account for over 3,000 kilograms of marijuana for Sentencing Guidelines purposes. Were we not even to consider the additional 1,000 harvested plants discovered in Ritchie County, the overall kilogram weight would admittedly be lower than that calculated by the district court, but would still be within the 3,000 to 10,000 kilogram range used to calculate McCoy's sentence. *See* U.S.S.G. § 2D1.1(c)(5) (applying base offense level of 34 to any marijuana conviction between three and ten thousand kilograms). When the Ritchie County plants are added, the 3,035 kilogram figure grows even further. Regardless of how the weight of those 1,000 plants are calculated, McCoy will be saddled with the same base offense level. Accordingly, we leave for another day the question of whether harvested marijuana plants are to be treated differently than live plants for sentencing purposes.

### III.

Heater, McCoy's principal co-conspirator, attacks the jury verdicts against her on both substantive and procedural grounds. She claims that the evidence was insufficient to sustain her conspiracy, money laundering, and perjury convictions. Heater also asserts that the district court improperly admitted hearsay statements made by two of her best friends, Becky Giles and Kim Foster. Finally, Heater challenges the district court's handling of the sentencing phase of her trial. We find all of her challenges to be without merit and, therefore, affirm.

### A.

One of Heater's primary arguments on appeal is that insufficient evidence existed to convict her of conspiring to manufacture, possess, and distribute marijuana. A trier of fact is given substantial latitude in its effort to determine whether a person is guilty of participation in a conspiracy. "Proof of a conspiracy may of course be by circumstantial evidence; it need not and normally will not be by direct evidence." *United States v. Giunta*, 925 F.2d 758, 764 (4th Cir.1991); *United States v. Bell*, 954 F.2d 232, 236 (4th Cir.1992); *see also United States v. Jackson*, 863 F.2d 1168, 1173 (4th Cir.1989) (noting that "circumstantial evidence is treated no differently than direct evidence, and may be sufficient to support a guilty verdict even though it does not exclude every reasonable hypothesis consistent with innocence").

The essential elements of the crime of conspiracy are well established in this circuit. The government must prove:"(1) an agreement between two or more persons (who are not government agents), (2) to commit in concert an unlawful act." *Giunta*, 925 F.2d at 764. In *Bell*, we held that "the totality of the circumstances shown by the government may suffice to infer the agreement necessary for a conspiracy conviction." 954 F.2d at 236. As we noted in *United States v. Moore*, 11 F.3d 475 (4th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1864, 128 L.Ed.2d 486 (1994), in drug conspiracy cases such as this, "the government need not [also] prove the commission of an overt act in

---

*States v. Haynes*, 969 F.2d 569, 570 (7th Cir. 1992). The *Haynes* court recognized that nothing in the Sentencing Guidelines suggests that a distinction should be drawn, for sentencing purposes, between harvested and unharvested plants. *Id.; see also Wegner*, 46 F.3d at 927 (adopting *Haynes* court's position that one kilogram conversion ratio applies even when live plants are not seized).

3. For sentencing purposes, the district court accepted these figures, but observed that the amount of marijuana "[l]ikely [] exceeds 6,000 and approaches possibly 8 or 9 [thousand plants]." Joint Appendix, at 2385.

furtherance of the conspiracy." *Id.* at 480; *United States v. Clark,* 928 F.2d 639, 641 (4th Cir.1991) (joining great majority of circuits in holding that it is neither necessary to allege or prove an overt act in a § 846 conspiracy). The Supreme Court recently adopted this position in *United States v. Shabani,* —— U.S. ——, ——, 115 S.Ct. 382, 386, 130 L.Ed.2d 225 (1994).

Heater is correct that "mere knowledge, acquiescence, or approval of a crime is not enough to establish that an individual is part of a conspiracy to distribute drugs." *United States v. Pupo,* 841 F.2d 1235, 1238 (4th Cir.), *cert. denied,* 488 U.S. 842, 109 S.Ct. 113, 102 L.Ed.2d 87 (1988). In this instance, however, Heater's conviction is affirmed because she was a primary participant in the marijuana conspiracy. Jerry Burkhammer testified that proceeds from the marijuana field were split between himself, McCoy, Heater, and two others. Bobby Timms testified that Heater drove him and other workers to the marijuana field. Chris and Robert McKinney each testified that Heater was present during marijuana purchases. Sandra Poleway testified that she purchased marijuana from Heater on more than one occasion and that Heater had told her that "she had gotten shake [marijuana] off of Tim's buds."

This was not the type of "shadowy" record that led to our reversal of conspiracy convictions in *Giunta,* 925 F.2d at 765, where the government's evidence "consist[ed] primarily of the testimony of its investigative agents." *Id.* Here, the most incriminating evidence came from Heater's co-conspirators and drug-related associates. A rational trier of fact had more than enough evidence upon which it could base a guilty verdict. Heater's § 846 conspiracy conviction is accordingly affirmed.

### B.

Heater claims that the district court committed reversible error by permitting Giles and Foster to testify regarding conversations in which Heater told each of them that the I–79 marijuana field belonged to her and McCoy. We conclude that the district court did not abuse its discretion in permitting these non-hearsay statements to be allowed into evidence under Federal Rule of Evidence 801(d)(2). *See United States v. Clark,* 986 F.2d 65, 68 (4th Cir.1993) (applying abuse of discretion standard when reviewing admissibility of evidence).

After an extensive voir dire of Giles, the court concluded that "[t]he statement regarding the '88 field may come in and it may come in in its full context." Joint Appendix, at 1150. The court did not clarify, however, whether the statement was being allowed in as non-hearsay under Rule 801(d)(2)(A) as Heater's own statement or under Rule 801(d)(2)(E) as a statement made by Giles—as a co-conspirator—during the course and in furtherance of the conspiracy. With respect to Foster, however, the district court found that the remarks were coconspirator statements made in furtherance of the conspiracy and of the cover-up of Heater's involvement. Joint Appendix, at 621. We find that the district court did not abuse its discretion in admitting Foster's testimony. We also find that Giles' testimony, though not admissible under Rule 801(d)(2)(E), was admissible under Rule 801(d)(2)(A).

In order to admit evidence under 801(d)(2)(E), the moving party must show by a preponderance of independent evidence that (1) a conspiracy existed; (2) the declarant and the defendant were members of the same conspiracy; and (3) the statement was made in the course of and in furtherance of that conspiracy. *Jackson,* 863 F.2d at 1171. The government presents no evidence linking Giles to the conspiracy. The fact that she may have received marijuana from Heater periodically is not sufficient to demonstrate an agreement between her and members of the drug ring, nor does it demonstrate an overt act on her part in furtherance of the agreement. *Meredith,* 824 F.2d at 1428. In addition, all indications from voir dire are that Heater's remarks about her co-ownership of the I–79 field were not made "in the course of and in furtherance of the conspiracy," as required under *Jackson.* There is no evidence suggesting that ownership of the I–79 field was discussed in the context of a larger discourse about the drug conspiracy.

In fact, Giles learned of Heater's co-ownership of the I–79 marijuana field long after authorities had seized the field and not as a result of any attempt on Heater's part to cover up her involvement. On prior occasions, we have chosen not to read the "in furtherance" requirement of Rule 801(d)(2)(E) broadly, *see United States v. Urbanik,* 801 F.2d 692, 698 (4th Cir.1986) (idle conversation, which touches upon but does not further a conspiracy, is not admissible), and we do not choose to expand unnecessarily the scope of nonhearsay in this case. Although not admissible as the statement of a coconspirator, Giles' testimony was properly admitted under Rule 801(d)(2)(A) as Heater's own statement. *See* Fed.R.Evid. 801(d)(2)(A) (out-of-court statement by a party is not hearsay when it is offered at trial against the party).

■ Even assuming, arguendo, that the district court erred in admitting Heater's conversations with Giles and Foster, any such error would have been harmless. The court's evidentiary rulings are not to be disturbed unless an error affected Heater's substantial rights. *United States v. Nyman,* 649 F.2d 208, 211 (4th Cir.1980); Fed.R.Crim.P. 52. As we noted in *Nyman,* in order to find a district court's error harmless, we need only be able to say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Id.* at 211–12 (quoting *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946)).

■ Unlike *Nyman,* in which the erroneously excluded testimony was "not only central, but was essentially the only controverted issue in the case," *id.* at 212, a wealth of testimony linked Heater to the drug conspiracy. This is not a "close" case factually as was *Nyman,* where the defendant's guilt or innocence turned on the credibility of an eyewitness' identification. Heater overstates her position when she claims that "the most persuasive evidence against[her] on this issue was no doubt the testimony of her two best friends." Appellants' Br., at 32. Heater ignores the equally powerful testimony of Burkhammer, Timms, the McKinneys, and

Poleway, all of whom linked her directly to McCoy's marijuana enterprise. We find that "the judgment was not substantially swayed by the error," *Urbanik,* 801 F.2d at 698, and affirm Heater's conspiracy conviction.

## C.

■ Heater next claims that the district court denied her a fair trial based upon the court's handling of voir dire. The court's decision not to ask two of Heater's proposed voir dire questions does not, in and of itself, merit reversal of Heater's convictions, particularly when the court ended up excusing two potential jurors for the precise reasons of concern to Heater. "A trial court has broad discretionary powers in conducting the voir dire of a jury and in phrasing the questions asked," *United States v. Robinson,* 804 F.2d 280, 283 (4th Cir.1986), and we find no abuse of discretion to have occurred in this instance.

■ Heater's proposed questions were substantially similar to those asked by the court. Heater requested that her twenty-third and twenty-fourth questions be asked in order to determine "if any potential jurors viewed themselves as soldiers in the 'War on Drugs'":

23. Do you believe the government should be allowed to violate individual rights, if necessary, to win the "War on Drugs"?

24. Would you be reluctant to return a "Not Guilty" verdict in this case because you think you should assist the government in the "War on Drugs"?

The district court's own questions served essentially the same purpose. First, the court asked whether any of the jurors would be biased or prejudiced against a person accused of selling marijuana. Supplemental Appendix, at 1. One venireperson said that he would be unable to remain impartial, and the court excused him. Second, and most related to Heater's request, the court asked whether "any of you have affixed or attached to the bumper of your car or any other property a sticker with a slogan, 'Support Your Local Police', 'Dare to be Against Drugs' or any other law enforcement orient-

ed slogan?" *Id.* at 2. Although no one admitted to possessing such stickers, one woman identified herself as once having worked for the drug awareness organization, DARE. She was excused after she informed the court that she could not render an impartial decision. There is no indication that any other venirepersons were predisposed towards returning a guilty verdict. Heater claims she was prejudiced by the court's failure to include her questions, but does not identify a single venireperson who was inappropriately seated as a member of the jury.

█ The district court questioned the jury to ensure against bias and partiality. Based on the court's questioning, two potential jurors were dismissed. It was not an abuse of discretion to determine that Heater's questions were unnecessary. Moreover, we have never suggested that a district court is obligated to ask each question proposed by a defendant. To do so would defeat the purpose of our pronouncement in *Robinson* that handling of voir dire is to be left in the sound discretion of the trial judge. 804 F.2d at 283. We find no basis for reversing Heater's convictions on this ground.

### D.

█ We will not reverse a conviction based on improper jury instructions as long as the instructions given by the district court, as a whole, included the substance of the defendant's requested conspiracy charge. *United States v. Dorta,* 783 F.2d 1179, 1183 (4th Cir.), *cert. denied, Drum v. United States,* 477 U.S. 905, 106 S.Ct. 3274, 91 L.Ed.2d 564 (1986). The critical inquiry is whether the court's charge was "sufficiently precise to instruct the jury in the defendant's theory of defense." *Id.* (quoting *United States v. Miller,* 658 F.2d 235, 237 (4th Cir. 1981)). Here, a portion of the court's instructions regarding the § 846 conspiracy charge mirrored Heater's proposed fifth instruction.

█ Heater's proposed instruction #5 was designed to explain to the jury that being McCoy's companion did not necessarily make Heater a conspirator. Although the district court did not include the proposed instruction in its charge, it took Heater's

concerns into account when it instructed the jury in the following manner:

> Of course, mere presence at the scene of an alleged transaction or event, mere association with persons conducting the alleged activity, or mere similarity of conduct among various persons and the fact that they may have associated with each other, and may have assembled together and discussed common aims and interests, does not necessarily establish proof of the existence of a conspiracy. Also, a person who has no knowledge of a conspiracy, but who happens to act in a way which advances some object or purpose of a conspiracy, does not thereby become a conspirator.

Supplemental Appendix, at 22. We find this instruction to have fully covered the concern raised by Heater in her proposed instructions. Moreover, Heater does not demonstrate that the district court's decision not to include her proposed instruction prejudiced her in any way. The district court simply chose to rephrase portions of Heater's proposal. Heater's § 846 conviction is accordingly affirmed.

### IV.

Sentenced to sixty months in prison on one count of perjury, appellant John challenges his conviction and sentence on two grounds. While we affirm the underlying conviction, we remand for resentencing.

### A.

█ The jury found John guilty of perjury based on two false declarations he had made to the grand jury regarding his use of marijuana and his involvement with McCoy. 18 U.S.C. § 1623(a) provides that "[w]hoever under oath ... in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration ... shall be fined not more than $10,000 or imprisoned not more than five years, or both." John argues on appeal that he was wrongly convicted, because he was not given the opportunity to clarify his initial negative response to the question of whether he knew of any drug activity on the part of McCoy. Although

John eventually acknowledged that he had smoked marijuana with McCoy, he never admitted to the grand jury that he knew of McCoy's cultivation of marijuana. By testifying under oath that he did not know of McCoy's illegal narcotics activities, John made a false *material* declaration. John's statements to the grand jury were responsive, but deliberately false.

 John also contends that he should not have been convicted of perjury based on his answer to the question of whether he had ever bought *or* sold marijuana. According to John, this was a "misleading double question" that should have been struck from the record. To support his argument, he cites a "double question" that was asked of another witness at the trial—"did you receive[a subpoena] prior to your incarceration *or* when he [a fellow conspirator] was incarcerated." The critical difference between this compound question and the one asked of John during the grand jury proceedings is that the question to John was intelligible, while the other one was not. We agree with John that a person must be able to understand the question being asked, *United States v. Paolicelli*, 505 F.2d 971 (4th Cir.1974), but we find no basis for concluding that the question asked of him during the grand jury proceedings was particularly confusing. John dramatically overstates the complexity of the questions to which he had to respond. The questions were neither vague nor misleading.

In *United States v. Yasak*, 884 F.2d 996, 1002 (7th Cir.1989), the Seventh Circuit considered a similar case in which a defendant contested his perjury conviction on the basis that he had been asked a question containing a double negative that could not be answered with a simple yes or no response. The *Yasak* court concluded that when "[p]ut in context, the questions were understandable and plainly clear enough to elicit informed and intelligent responses." *Id.* In this case, as in *Yasak*, we find no "fundamental ambiguity" that would have required the district court to remove the questions from the jury's

consideration. *Id.* at 1003.[4] John's perjury conviction is, therefore, affirmed.

**B.**

The issue of whether John was sentenced properly under the Sentencing Guidelines is more troublesome. Resolving this issue requires us to do more than simply choose between the different results reached in our decisions in *United States v. Pierson*, 946 F.2d 1044 (4th Cir.1991), and *United States v. Jamison*, 996 F.2d 698 (4th Cir.1993), as the parties would have us do. Ultimately, we find that the district court should have sentenced John under *Pierson*, although we arrive at that conclusion only after conducting a rather detailed study of the relevant Sentencing Guidelines provisions and John's constitutional rights.

The sentencing range applicable in this case differs substantially, depending on whether John is sentenced solely under section 2J1.3 or under section 2J1.3 in conjunction with section 2X3.1. Section 2J1.3(a), one of the Guidelines' cross-reference sections, provides a base offense level of twelve for perjury. Section 2J1.3(c) provides, however:

> If the offense involved perjury, subornation of perjury, or witness bribery in respect to a criminal offense, apply § 2X3.1 (Accessory After the Fact) in respect to that criminal offense, if the resulting offense level is greater than that determined above.

United States Sentencing Commission, *Guidelines Manual*, § 2J1.3(c) (Nov.1993). When section 2J1.3 is applied alone, independent of section 2X3.1, a defendant will receive a sentence between ten and thirty-seven months in prison (the applicable range for a base offense level of twelve), depending on his criminal history category. Because the district court set John's criminal history category at IV, and did not add any adjustments to John's base offense level, a "pure"

---

4. As for John's argument that his conviction should be overturned under the "exculpatory no" doctrine, this court has never extended that doctrine beyond the 18 U.S.C. § 1001 setting. *United States v. Moore*, 27 F.3d 969 (4th Cir.), *cert.* denied, —— U.S. ——, 115 S.Ct. 459, 130 L.Ed.2d 367 (1994). It is read as a rather "narrow exception to section 1001's plain language," *id.* at 979, and we find no basis for extending the doctrine to the facts of this case.

section 2J1.3 sentence would be between twenty-one and twenty-seven months.

When section 2X3.1 is applied, however, rather than a base offense level of twelve, the defendant receives a base offense level "6 levels lower than the offense level for the underlying offense, but in no event less than 4, or more than 30." U.S.S.G. § 2X3.1(a). The term "underlying offense" is defined as "the offense as to which the defendant is convicted of being an accessory." § 2X3.1, comment. (n. 1). In this case, the underlying offense was conspiracy, which draws an offense level of 32. U.S.S.G. § 2D1.1(c)(4) (conspiracy involving at least 1,000 kilograms but less than 3,000 kilograms of marijuana). Subtracting six levels, as required by section 2X3.1, results in an offense level of 26, for which a defendant with a criminal history category of IV receives a sentence between 92 and 115 months. Constrained by 18 U.S.C. § 1623(a), which provides a maximum allowable prison term of 60 months for perjury, the closest the district court could get to the appropriate range was to sentence John to the full 60 months. *See* Joint Appendix, at 2572 (applying section 5G1.1(a)'s requirement that statutorily authorized maximum sentence operate as guideline sentence where statutory maximum is less than applicable guideline imprisonment range).

Having noted the sentencing disparity between sections 2J1.3 and 2X3.1, the first critical question for us to resolve is whether section 2X3.1 applies by its terms in this case. We have considered the applicability of section 2X3.1 in this general context on two other occasions, arriving at different results on what were considered distinguishing facts. In *Pierson*, 946 F.2d 1044, the defendant was charged in a three count indictment resulting from a bombing incident at a bank in Sutton, West Virginia. *Id.* at 1045. The first two counts related to the explosion itself, while the third count charged Pierson with making false declarations to the grand jury. The allegedly false declarations were Pierson's denials that he was anywhere near the bank on the day of the bombing. Although acquitted on Counts I and II, Pierson was convicted under 18 U.S.C. § 1623 of having made false declarations. The government urged that Pierson be sentenced as an accessory after the fact under sections 2J1.3 and 2X3.1. We affirmed the district court's decision not to apply the cross-referenced 2X3.1 provision, concluding that, by its terms, section 2X3.1 did not apply to the facts of the case. *Id.* at 1046–49.

Critical to our *Pierson* decision was the determination that when the defendant lied to the grand jury, "it seems more than likely that Pierson was trying to protect himself, rather than others." *Id.* at 1048. The fact that Pierson had been charged as a principal in the bombing, and not as an accessory, convinced us that Pierson's primary motivation for lying to the grand jury was to protect himself. *Id.* Borrowing on the analysis of *United States v. Berkowitz*, 712 F.Supp. 707 (N.D.Ill.1989), *rev'd on other grounds*, 927 F.2d 1376 (7th Cir.1991), we found that it would not make sense to treat Pierson as an accessory to his own alleged explosives charges. *Pierson*, 946 F.2d at 1048–49 (citing *Berkowitz*, 712 F.Supp. at 709). *Pierson*, therefore, limited application of section 2X3.1 to those cases in which defendants make false declarations for the purpose of assisting *other* persons. *Pierson*, 946 F.2d at 1049.

Unlike *Pierson*, in which the defendant faced conviction as a principal in the underlying offense, *Jamison*, 996 F.2d 698, involved a defendant whose sole motivation for making false declarations to a grand jury was to assist others. During the summer of 1990, Jamison had worked as an undercover informant for the Drug Enforcement Agency. In August 1990, Paul Simmons approached Jamison, expressing an interest in purchasing a kilogram of cocaine. *Id.* at 699. Having received approval from DEA agents, Jamison negotiated the sale and later served as a government witness against Simmons at trial. The difficulty for Jamison, however, was that his "version of these events went back and forth more often than a badminton bird." *Id.* At Simmons' trial, Jamison admitted to having lied before the grand jury, but reversed his story once more at Simmons' sentencing hearing. Jamison eventually pled guilty to making a false declaration under oath, in violation of 18 U.S.C. § 1623(c). At

Jamison's own sentencing hearing, the district court declined to sentence Jamison within the range for an accessory after the fact.

On appeal, Jamison claimed that, like Pierson, he could not be sentenced under section 2X3.1, because his primary motivation for lying to the grand jury was to protect himself rather than others. Distinguishing the cases from one another, we read *Pierson* as requiring a cross reference to section 2X3.1 *"unless* the 'underlying offense' to which the latter section [2X3.1] refers was one for which the defendant was exposed to criminal prosecution." *Jamison*, 996 F.2d at 701. The fact that Jamison had allegedly helped Simmons avoid conviction only to "prevent reprisals" from a known cocaine distributor, *id.* at 700, was irrelevant. The significant fact was that, unlike Pierson, Jamison had not been charged as a principal in the underlying offense. We held that the concern underlying *Pierson*, "namely, that an individual not be sentenced as an accessory to his own crime, is not implicated in cases such as this one where the defendant is at no risk of criminal punishment for the underlying offense." *Id.* at 701. Because Jamison had no reason to fear punishment for the substantive crimes in the case, we concluded that he intended through false statements to aid others and could be sentenced under the accessory guideline. *Id.; see also United States v. Curry*, 977 F.2d 1042, 1059 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1357, 122 L.Ed.2d 737 (1993) (concluding that analysis of *Pierson* is not relevant where defendant, who received immunity for his testimony, was "clearly trying to protect others, and not himself").

Unlike Jamison, who "lied about a criminal offense for which he was at no risk of indictment," *Jamison*, 996 F.2d at 701, John had already been charged in the marijuana conspiracy by the time he faced the grand jury. The grand jury, in fact, indicted him under 21 U.S.C. § 846 along with McCoy and Heater. Joint Appendix, at 30. The fact that John was facing indictment on conspiracy charges at the time he made his false declarations to the jury aligns his case more closely with *Pierson*. Like Pierson, John faced potential prosecution as a principal in the

offense addressed by his false statements. Under the *Jamison* analysis, *Pierson* applies "to cases in which a criminal defendant lies to protect himself or herself from criminal punishment for the offense addressed by a false statement." *Jamison*, 996 F.2d at 701. In making a false declaration to the grand jury, Jamison did not intend to exculpate himself from any charge, while John and Pierson did.

Were our discussion to end at this stage— as both John and the government indicate that it should—we would be led to conclude that *Pierson*, rather than *Jamison*, controls the outcome of this case and that the district court erred in sentencing John as an accessory after the fact under section 2X3.1. One very troubling point remains to be considered—it does not appear that *Pierson* remains good law in light of an amendment to the Sentencing Guidelines that took effect one month after publication of our decision in that case. It is to this issue that we now turn.

We began our analysis in *Pierson* by noting that we had been unable to find caselaw "directly dealing with the interplay between § 2J1.3 and § 2X3.1." *Pierson*, 946 F.2d at 1047. As a result, we turned our attention to Guideline section 2J1.2, the Obstruction of Justice provision, which we found to be substantially similar to section 2J1.3's perjury provision. *See id.* at 1047 (making line by line comparison of sections 2J1.2 and 2J1.3). The obstruction of justice and perjury sections both begin with a base offense level of 12, add 8 levels if the offense involved personal injury or property damage, add 3 levels if the offense resulted in a substantial interference with the administration of justice, and most importantly, cross reference section 2X3.1 if the offense was "in respect to a criminal offense." For all practical purposes, we found the language of the two sections "identical." *Id.*

The similarities between sections 2J1.2 and 2J1.3 are no coincidence and, in the commentary to the perjury section, the Sentencing Commission indicated that the two sections should be interpreted in the same fashion. *See* U.S.S.G. § 2J1.3, comment (backg'd) (noting that the "same considerations for en-

hancing a sentence are applied [under sections 2J1.2 and 2J1.3], and an alternative reference to the guideline for accessory after the fact is made"). Because of the commentary's reference to the similarities between the two sections, the *Pierson* court found it appropriate to consider the commentary to the obstruction of justice section in an attempt to understand when cross reference to section 2X3.1 is appropriate under section 2J1.3. The 1989 version of the Guidelines Manual, under which the *Pierson* court was operating, provided the following as background commentary to section 2J1.2:

> The specific offense characteristics reflect the more serious forms of obstruction. Because the conduct covered by this guideline *is frequently part of an effort to assist another person to escape punishment for a crime* he has committed, an alternative reference to the guideline for accessory after the fact is made.

U.S.S.G. § 2J1.2, comment (backg'd) (emphasis added). This commentary played a critical role in the Eleventh Circuit's decision in *United States v. Huppert,* 917 F.2d 507 (11th Cir.1990), in which that court reversed the trial court's decision to cross reference section 2X3.1 from section 2J1.2. Like Pierson, Huppert faced potential prosecution for an underlying offense; and, as a result, the Eleventh Circuit refused to label Huppert an accessory after the fact. According to the *Huppert* court, application of section 2X3.1 would only have been appropriate had the defendant's conduct been part of an effort to assist another person to escape punishment for a crime. *Id.* at 511 (citing § 2J1.2, comment (backg'd)).

Although in *Pierson* we were dealing with section 2J1.3 rather than section 2J1.2, we found *Huppert*'s reasoning instructive. *Pierson,* 946 F.2d at 1048. By way of analogy, *id.* at 1049, we interpreted the background commentary to section 2J1.2 as meaning that cross reference of section 2X3.1 is appropriate only in those instances in which a defendant is properly characterized as an accessory and not as a principal. We left no doubt that our analysis rested on section 2J1.2's background commentary.

As we noted in a footnote to our *Jamison* decision, "[i]n 1991, the Guidelines Commission amended the commentary on which both the *Pierson* and *Huppert* courts relied." *Jamison,* 996 F.2d at 701 n. 3. Despite our belief that the amendment "casts doubt upon the continued validity of those decisions," we "reserve[d] for another day a decision on the impact of the amended commentary on our precedent." *Id.* That day has now come.

We read the change to section 2J1.2's background commentary as being a fairly significant one. The amendment altered the commentary as follows:

> [B]ecause the conduct covered by this guideline is frequently part of an effort to ~~assist another person to escape punishment for a crime which he has committed, an alternative reference to the guideline for accessory after the fact is made~~ [avoid punishment for an offense that the defendant has committed or to assist another person to escape punishment for an offense, a cross reference to § 2X3.1 (Accessory After the Fact) is provided. Use of this cross reference will provide an enhanced offense level when the obstruction is in respect to a particularly serious offense, whether such offense was committed by the defendant or another person.]

Guidelines Manual, § 2J1.2, comment (backg'd) (new material in brackets). Effective as of November 1, 1991, the amended commentary has remained unchanged as of the most recent version of the Guidelines Manual. Under the amended commentary, it is no longer the case that cross reference to section 2X3.1 is appropriate only when obstruction of justice has been committed for the purpose of assisting "another person to escape punishment." In its 1991 amendment, the Commission recognized that defendants sometimes obstruct justice for the sole purpose of avoiding punishment for an offense that they, themselves, have committed. We interpret the 1991 amendment as expanding section 2X3.1 cross referencing to include principals as well as accessories.

We find no reason to question our holding in *Pierson* that section 2X3.1's accessory after the fact provision applies with equal force in the section 2J1.2 and section 2J1.3 con-

texts. The effect of preserving the analogy between those provisions, however, is to recognize that *Pierson* is no longer good law. Other courts have already taken note of that consequence. *See, e.g., United States v. Glover*, 52 F.3d 283, 285–86 (10th Cir.1995) (criticizing *Pierson*'s refusal to cross reference section 2X3.1's accessory after the fact provision, particularly in light of 1991 modification to background commentary of section 2J1.2); *United States v. Bertoli*, 854 F.Supp. 975, 1145–46 (D.N.J.1994) (noting that *Pierson*'s refusal to apply section 2X3.1 is no longer appropriate under November 1991 Guidelines Manual, which eliminated distinction between crimes committed to assist others and crimes committed to protect oneself from punishment), *aff'd in part, vacated in part*, 40 F.3d 1384 (3rd Cir.1994).

Under other circumstances, the fact that *Pierson* is no longer good law in light of the amendment to section 2J1.2's background commentary would end our discussion of the matter. We have ruled today that the effect of the Sentencing Commission's change to section 2J1.2's background commentary was to increase the instances in which cross reference to section 2X3.1 is appropriate. As of November 1, 1991, it no longer matters, for cross referencing purposes, whether a defendant obstructed justice "to avoid punishment for an offense … [he] has committed or to assist another person to escape punishment for an offense." U.S.S.G. § 2J1.2, comment (backg'd) (Nov.1991). The *Pierson–Jamison* distinction between those who commit perjury to protect themselves from prosecution and those who commit perjury for the sole purpose of assisting another is no longer relevant. Each perjurer will face an enhancement of his base offense level under section 2X3.1.

■■■■ Having determined that the November 1991 amendment significantly impacts our handling of section 2J1.3 sentences, the only remaining issue to resolve is whether the amendment applies to a defendant who perjured himself prior to the time the amendment took effect. As a general rule, a defendant's sentence should be based upon the Guidelines "in effect on the date the defendant is sentenced." 18 U.S.C. § 3553(a)(4); *United States v. Hartzog*, 983 F.2d 604, 608 (4th Cir.1993). We have held, however, that amendments to the Guidelines occurring after a defendant's offense but before sentencing should not be applied if doing so would increase the sentence, because that would violate the Ex Post Facto Clause in Article I, § 9 of the United States Constitution.[5] *See United States v. Morrow*, 925 F.2d 779, 782–83 (4th Cir.1991) (holding that Ex Post Facto Clause applies to federal Sentencing Guidelines); *see also Miller v. Florida*, 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987) (recognizing that Ex Post Facto Clause prevents a court from sentencing an offender under a new law that is more onerous than the one in effect when the offense was committed); *Hartzog*, 983 F.2d at 608 (quoting *United States v. Aymelek*, 926 F.2d 64, 66 n. 1 (1st Cir.1991)) ("Barring *ex post facto* concerns, the guidelines in effect at the

---

5. "No Bill of Attainder or ex post facto Law shall be passed." U.S. Const. art. I, § 9, cl. 3.

Although John did not raise the Ex Post Facto argument himself, we find it within our discretion to consider this constitutional concern *sua sponte*. On appeal, John has asked this court to apply *Pierson* rather than *Jamison*. The fact that *Pierson* can only be applied if we conduct an analysis of the Ex Post Facto doctrine does not dissuade us from resolving this issue. Although we recognize that on a previous occasion we chose not to reach similar ex post facto concerns when they had not been raised at the defendant's sentencing hearing, *Hartzog*, 983 F.2d at 608, we recognize—as did the *Hartzog* court—that such a decision is wholly discretionary. *See id.* (citing Supreme Court's decision in *Singleton v. Wulff*, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976), in support of its decision to "decline"

reaching ex post facto issue). In *Singleton*, the Court recognized that "[t]he matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." *Singleton*, 428 U.S. at 121, 96 S.Ct. at 2877. In "announcing no general rule," *id.* the Court noted that circumstances may arise in which "a federal appellate court is justified in resolving an issue not passed on below." *Id.* Of the two instances the Court cited—neither of which were intended to be exclusive, *id.* at 121 n. 8, 96 S.Ct. at 2877 n. 8—the Court noted that such review may be appropriate where "'injustice might otherwise result.'" *Id.* at 121, 96 S.Ct. at 2877 (quoting *Hormel v. Helvering*, 312 U.S. 552, 557, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941)).

time of sentencing, not those in effect when the crime was committed, control at sentencing."). To violate the ex post facto prohibition, a law must be retrospective, *Weaver v. Graham*, 450 U.S. 24, 29, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981), i.e., a law that "changes the legal consequences of acts completed before its effective date." *Moore*, 27 F.3d at 976 (quoting *Miller*, 482 U.S. at 430, 107 S.Ct. at 2451). Because the amended commentary to section 2J1.2 has the effect of providing a more severe punishment for the accused than was applicable at the time his offense was committed, it would be impermissible to apply the amended guidelines.[6]

■■■ The guidelines in effect as of November 1, 1991, result in harsher penalties for John than those in effect at the time John perjured himself in February 1991. Prior to the November 1991 amendment, John's case would have fallen squarely under *Pierson*, and cross referencing of section 2X3.1 would have been improper. After November 1, 1991, once the *Pierson–Jamison* distinction was eliminated as a result of the amendment to section 2J1.2's commentary, John would be appropriately sentenced under section 2X3.1.

We refuse to permit a violation of the Ex Post Facto Clause, however, where application of the amended language would have the effect of imposing a harsher sentence on a defendant than would have otherwise been applied had sentencing occurred under the version of the Guidelines Manual applicable at the time that the defendant committed the relevant offense. Our holding in *Pierson* remains circuit precedent for defendants, such as John, who committed the offense of perjury prior to the critical date of November 1, 1991. Therefore, we vacate John's sentence and remand this case to the district court for resentencing under section 2J1.3. In light of *Pierson*'s continued but limited

validity, cross referencing of section 2X3.1 was inappropriate in this case.

## V.

Appellants also raise numerous other issues that they contend should be resolved in their favor. We have carefully considered each of these arguments and find them to be without merit. For the foregoing reasons, we reject appellants' challenges and affirm their convictions and sentences, with the exception of John's perjury conviction, which we remand for resentencing. We further remand the case with instructions to the district court to vacate appellant McCoy's § 846 conspiracy conviction.

No. 94–5202—*AFFIRMED.*

No. 94–5215—*AFFIRMED IN PART, VACATED IN PART, AND REMANDED WITH INSTRUCTIONS.*

No. 94–5220—*AFFIRMED IN PART AND REMANDED WITH INSTRUCTIONS.*

---

**6.** The amended commentary that took effect on November 1, 1991, was more than a mere change of procedure, *Miller*, 482 U.S. at 430, 107 S.Ct. at 2451, or mere clarification to Guidelines' rules. *See United States v. Bertoli*, 40 F.3d 1384, 1405, 1407 (3rd Cir.1994) (recognizing that amendments which clarify, rather than substantively change, the guidelines do not present ex post facto issues when they are applied retro-

spectively, but holding that 1991 amendment to section 2J1.2's background commentary "is not a clarifying amendment but, rather, a substantive change"); *see also United States v. Johns*, 5 F.3d 1267, 1269 (9th Cir.1993) ("there can be no *ex post facto* problem if an amendment to the Guidelines merely clarifies its existing substance as opposed to changing its substance").