**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                          No. 95-5508

JAMES COWAN, a/k/a Wop,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                          No. 95-5509

ALPHONSO WHITE, a/k/a Poochie,
Defendant-Appellant.

Appeals from the United States District Court
for the Eastern District of Virginia, at Alexandria.
James C. Cacheris, Chief District Judge.
(CR-94-468)

Argued: May 8, 1996

Decided: September 16, 1996

Before WIDENER and MOTZ, Circuit Judges, and PHILLIPS,
Senior Circuit Judge.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Joseph N. Bowman, Alexandria, Virginia, for Appellant Cowan; Suzanne Little, Alexandria, Virginia, for Appellant White. Timothy Joseph Shea, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** Helen F. Fahey, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

———————————————————————————————

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

———————————————————————————————

**OPINION**

PER CURIAM:

These appeals concern the stabbing death of Michael Martin, an inmate at the maximum security facility of the Lorton Correctional Complex. A jury convicted appellants, James Cowan and Alphonso White, also inmates at the facility, of: (1) conspiracy to commit murder in violation of 18 U.S.C. § 1117, (2) murder and aiding and abetting in the commission of murder in violation of 18 U.S.C. §§ 1111 and 1112, and (3) possession of contraband in violation of 18 U.S.C. § 13, assimilating Virginia Code § 53.1-203(4). On appeal, Cowan and White assert numerous challenges to their convictions. Finding no reversible error, we affirm.

I.

On March 13, 1993, Michael Martin was fatally stabbed in the back during his allotted recreation period. That evening, Corrections Officer Bertram Long released Martin, along with two other inmates, Alphonso Williams and Cowan, from their cells onto the tier, for a brief recreation period. Officer Long and Corrections Officer James W. Wise sat at the front desk directly outside the tier gate where they

2

could observe the three inmates. A few minutes into the recreation period, Martin staggered toward the officers at the front desk, stated that he had been stabbed, and fell to the floor. Officers Long and Wise called for assistance and entered the tier to help Martin. In accordance with procedures, Officer Long searched Martin and found a twelve-inch shank concealed on his left thigh. Long also noticed blood and stab wounds on Martin's back.

Officers Long and Wise removed Martin's body from the tier while they waited for assistance. After other officers arrived, Long instructed them to search and handcuff inmates Williams and Cowan, and to begin a comprehensive search of the tier for the murder weapon. The officers uncovered several shanks but did not find the murder weapon.

Agent Daniel Sparks of the FBI investigated Martin's death. During investigatory interviews, Cowan and White made incriminating statements to Sparks. For example, on one occasion, Cowan told Sparks that "if the prosecutors could promise that his sentence would be limited to ten years, he would cop to the whole thing." On another occasion, White admitted to the agent that if blood was found on the knife recovered from his cell, then it was his "beef," meaning that he was responsible for the crime.

Nathaniel Curtis, an inmate in the cell adjacent to White's, had several conversations with White pertaining to Martin's murder. Before the murder, White told Curtis that Cowan was going to avenge the death of his relatives by "taking care" of Martin and that White himself had befriended Martin to "bait him in" so that Martin would not seek protective custody. Following the murder, White confided to Curtis that he had supplied the knife Cowan used to stab Martin and that Cowan had returned the knife to White immediately after the murder so that White could clean and hide it. Curtis explained that it was common knowledge that Martin was incarcerated at Lorton for murdering three members of Cowan's family.

Another inmate, Alphonso Williams, explained that prior to the murder, White warned him to stay away from Martin because Martin was "going to get his." Williams, who was released for recreation with Martin and Cowan at the time of the murder, saw Cowan

3

approach Martin from behind and stab Martin twice in the back. Cowan ran past Williams with a bloody butter knife and handed the knife to White, who was in his cell. Cowan then warned Williams to "keep [his] mouth shut" and gave the knife to White who hid it in his mattress. Tipped by Williams, authorities later found the sharpened butter knife in White's mattress.

Albert Colbert, also an inmate on the block, corroborated the accounts of the corrections officers and other inmates. Colbert saw Cowan stab Martin twice in the back without provocation and then saw Martin head toward the correction officers stationed at the gate. Martin asked them for help and then fell to the floor of the tier.

Finally, government forensics experts found that: DNA tests traced blood stains from the butter knife to Martin, a weapon consistent with the butter knife inflicted Martin's wounds, and Martin had no defensive wounds on his body to suggest a struggle or knife fight.

Although neither Cowan nor White testified, their witnesses and attorneys presented a different view of the facts. Cowan admitted to stabbing Martin but claimed that he did so in self-defense. Cowan offered evidence that Martin murdered three of his relatives, that he knew of Martin's violent character, and that he feared Martin. Two inmate-witnesses testified that, during recreation period, Cowan and Martin had engaged in a ferocious fight culminating in Martin's death. A District of Columbia police officer, Robert L. Milhouse, testified that Martin had a violent reputation on the street.

As for White, although he conceded possession of the sharpened butter knife, he maintained that he did not participate in the plan to murder Martin. White also argued that it would have been impossible for him to communicate with Curtis from his cell because Curtis' cell was too distant from his.

After a three day joint trial, the jury found Cowan and White guilty of all charges against them. The district court sentenced them to life imprisonment.

II.

Cowan makes several arguments relating only to his conviction. We consider his strongest argument first.

A.

Cowan contends that the district court erred in allowing Curtis to testify about his conversations with White about Martin's murder. Curtis testified that White told him that Cowan killed Martin because Martin had killed members of Cowan's family. Curtis further testified that White admitted giving Cowan the knife, and that after Cowan stabbed Martin in the back, Cowan threw the knife back into White's cell. Cowan contends that Curtis' testimony should not have been admitted against him because it constitutes inadmissible hearsay.

In response, the government argues that White's statements were relevant and properly admitted as admissions by a party opponent under Federal Rule of Evidence 801(d)(2)(A). White's defense centered on his claim that he had no prior knowledge that Cowan would attack Martin. White maintained that although Cowan threw the murder weapon into White's cell after the murder, White did not participate in the murder. White's statements to Curtis directly contradicted this defense, and thus were properly admitted against <u>White</u>. However, this does not render them admissible against Cowan.

The government does not assert that any recognized hearsay exception made White's statements admissible <u>as to Cowan</u>.[1] Instead, the government insists that the statements were not offered against Cowan but only against White. However, Cowan points out that the district court gave no limiting instruction requiring the jury to disregard Curtis' testimony in determining Cowan's guilt. Absent such an instruction, nothing prevented the jury from considering the evidence against both appellants.

As part of his hearsay argument, Cowan asserts that Curtis' testimony was prejudicial to Cowan's case because it "provided a vivid image of Cowan stabbing Martin and then attempting to conceal the

_____

[1] Although the government argued before the district court that Curtis' testimony was admissible against both Cowan and White as a statement against interest under Federal Rule of Criminal Procedure 804(b)(3), the government has now abandoned this argument. On appeal, the government claims instead that the Curtis testimony was not offered against Cowan at all.

5

evidence by throwing the murder weapon in White's cell. The testimony also contradicted Cowan's defense of self-defense by offering revenge as the motive for the killing." Cowan complains that, because White did not testify, Cowan could not cross-examine him regarding his statements to Curtis. Although Cowan does not cite United States v. Bruton, 391 U.S. 123 (1968), this argument is essentially a Bruton challenge to the admission of a co-defendant's statements.

In Bruton, the Supreme Court held that the admission of the incriminating statements of a non-testifying co-defendant violates a defendant's Sixth Amendment confrontation rights when the statements, while properly admissible against the co-defendant, constitute inadmissible hearsay against the defendant. The government argues that Bruton does not apply here because the co-defendant made incriminating statements to a fellow inmate. According to the government, Bruton only applies to statements or confessions of a co-defendant made to law enforcement authorities.

The government misreads Bruton. Although the Supreme Court did recognize that a defendant's motivation to shift the blame to a co-defendant may make the defendant's statements "inherently suspect," id. at 135-36, the government overstates this as the animating principle of Bruton. Also underlying Bruton are the importance of the defendant's right to confront the witnesses against him and the "substantial risk" that the jury, despite limiting instructions, will consider the incriminating statements against the wrong defendant. Id. at 126. Because these concerns weigh heavily in this case--e.g., Cowan could not cross-examine White and the jury received no limiting instructions to disregard the evidence in determining Cowan's guilt-- this case falls squarely within the prohibition of Bruton.

In United States v. Truslow, 530 F.2d 257 (1975), we considered a similar argument by the government to limit the scope of Bruton to statements by co-defendants to law enforcement officers. There, Truslow's co-defendant, Davidson, made incriminating statements to an acquaintance about participating in a "murder for hire" ordered by Truslow. Id. at 259. The acquaintance later testified against Davidson, but his testimony was inadmissible as to Truslow. Accordingly, Truslow raised a Bruton objection. In response, the government argued, inter alia, that Bruton "should not apply to this case because Bruton

6

was the case of a confession to law enforcement officers." Id. at 263. Finding that this did not sufficiently distinguish this case from Bruton, we expressly rejected this argument. We reject it again here. Following our reasoning in Truslow, we conclude that Bruton applies to Curtis' testimony regarding his conversation with White.

Having found Bruton implicated here, we turn to the government's alternative argument that any error committed in admitting Curtis' testimony was harmless. We find this argument persuasive. With respect to Cowan, Curtis testified to the following facts: (1) Cowan stabbed Martin in the back; (2) Cowan killed Martin because Martin had killed Cowan's relatives; (3) Cowan threw the knife into White's cell after the murder. Other evidence independently established each of these facts.

Throughout the trial, Cowan admitted that he had killed Martin, but claimed that he acted in self-defense. Moreover, it was undisputed that Cowan killed Martin by stabbing him in the back. Indeed, two eyewitnesses, Albert Colbert and Alphonso Williams, testified to seeing Cowan kill Martin by stabbing him in the back.

As to the fact that Cowan killed Martin because Martin had murdered members of Cowan's family, Cowan himself repeatedly introduced evidence that Martin had murdered his relatives. Presumably to strengthen his self-defense claim, Cowan wanted to convince the jury that he knew of Martin's violent nature. While this evidence may have indicated that Cowan had reason to fear Martin, it also provided the jury with a motive for Cowan's crime.[2] Significantly, in discussing the motive for the murder, Agent Sparks asked Cowan whether he was "avenging the deaths of [his] relatives that had been killed by Michael Martin." Cowan responded, "That's for sure." Given this admission to Sparks, Cowan cannot now argue that the jury would not have had evidence of his motive absent Curtis' statements.

_____

[2] Ironically, Cowan's self-defense argument was undermined by the same evidence he believed would bolster it. Even absent this evidence by Cowan, his claim of self-defense was independently discredited by the fact that Martin was stabbed in the back, and by the testimony of inmate Colbert that Martin was surprised by the attack, looked "like he couldn't believe it," and did not strike or provoke Cowan in any way.

7

Finally, Alphonso Williams' testimony also established the fact that Cowan threw the bloody murder weapon into White's cell. Williams testified that he saw Cowan give White the weapon following the murder and that he directed the authorities to search for the weapon in White's mattress. The fact that the weapon was later discovered hidden in White's mattress corroborated this testimony.

In light of these independent sources of evidence, the admission of Curtis' testimony as to his conversation with White was harmless.**3** See, e.g., Morrison v. Duckworth, 929 F.2d 1180, 1181 (7th Cir. 1991) (harmless error when non-testifying co-defendant's statement implicated defendant because defendant admitted involvement in the charged crime); United States v. Ruff, 717 F.2d 855, 858 (3d Cir. 1983) (harmless error when non-testifying co-defendant's statements implicated defendant because independent evidence of guilt overwhelming), cert. denied, 464 U.S. 1051 (1984); Tamilio v. Fogg, 713 F.2d 18, 21 (2d Cir. 1983) (overwhelming evidence of defendant's participation in murders and robbery made any error in admitting co-defendant's confessions harmless), cert. denied , 464 U.S. 1041 (1984).

B.

In an argument related to his Bruton challenge, Cowan alleges that the district court erred in denying his motion to sever his trial from White's. As Cowan acknowledges, the grant or denial of a motion to sever will not be overturned absent a clear abuse of discretion. United States v. Hayden, 85 F.3d 153, 160 (4th Cir. 1996). In order for the denial of severance to constitute an abuse of discretion, a defendant must show that a joint trial "would have prevent[ed] the jury from

_____

**3** Perhaps, recognizing this, Cowan contends that in addition to the facts Curtis related, his statement is fatally prejudicial because it provided the jury with a "vivid image" of Cowan stabbing Martin in the back. Curtis' testimony that White told him that Cowan "stabbed the dude" by "hit-[ting] him in the back one time," while graphic, was certainly less vivid than other evidence the government introduced. For example, Alphonso Williams testified that he saw Cowan "yoke [Martin] around the neck" and stab him twice in the back with "a tremendous force," making Martin's body "jerk[ ]."

8

making a reliable judgment about guilt or innocence." Zafiro v. United States, 506 U.S. 534, 539 (1993). Because we have already determined that no prejudice resulted to Cowan from the admission of Curtis' testimony, we conclude that the trial court acted within its discretion in denying the motion for severance.

C.

Cowan asserts that the district court erred in denying his motion to suppress statements made to FBI agents on March 29, April 1, and April 12, 1993. He contends that these statements were made in the course of plea negotiations and thus their admission violated Federal Rule of Criminal Procedure 11 and Federal Rule of Evidence 410. Both rules bar admission of "any statement made in the course of plea discussions with an attorney for the government." Fed. R. Crim. P. 11(e)(6)(D). See Fed. R. Evid. 410(3) (incorporating by reference Fed. R. Crim. P. 11).

The district court denied Cowan's motion to suppress because the court found that "none of [his] statements were taken in the process of any plea negotiations." We review a district court's evidentiary rulings for abuse of discretion. See United States v. Heater, 63 F.3d 311, 320 (4th Cir. 1994).

"[P]lea negotiations, in order to be inadmissible, must be made in negotiations with a government attorney or with that attorney's express authority." United States v. Porter , 821 F.2d 968, 977 (4th Cir. 1987), cert. denied, 485 U.S. 934 (1988). "In addition, conversations with government agents do not constitute plea discussions unless the defendant exhibits a subjective belief that he is negotiating a plea, and that belief is reasonable under the circumstances." United States v. Sitton, 968 F.2d 947, 957 (9th Cir.), cert. denied, 506 U.S. 979 (1992), and cert. denied, 507 U.S. 929 (1993). Cowan can demonstrate neither that he negotiated with a government attorney (or with one who had an attorney's express authority), nor that he reasonably believed that he was negotiating a plea.

With regard to the first requirement, Cowan made the statements at issue during the course of three interviews with FBI agents. No government attorney was present during those interviews. Moreover,

9

the agents repeatedly told Cowan that they did not have authority from any government attorney to engage in plea negotiations with him. Thus, Cowan presented no evidence that he negotiated with a government attorney or his designee.

As to Cowan's allegedly subjective, reasonable belief that he was negotiating a plea, the circumstances surrounding the interviews belie that claim. All three of Cowan's contacts with law enforcement officers took place before he had been charged with any crime. The agents were merely investigating the Martin murder when Cowan made his inculpatory statements. Thus, like the defendant in Porter, Cowan well may have made his statements not as part of a plea discussion, but rather "as an informant, hopeful of getting a break." Porter, 821 F.2d at 977.

Moreover, the substance of the discussions also undermines Cowan's claim to a reasonable subjective belief that he was negotiating a plea. During the course of the April 1 interview, Cowan told the agents that if the prosecutor could guarantee him a sentence between one and ten years, he would "cop to the whole thing" -- that is, he would accept responsibility for the murder and implicate the others involved. This indicates that, even subjectively, he understood that only the prosecutor could agree to a plea bargain. In fact, Agent Sparks responded to Cowan's statement by explaining that he did not have the power to agree to any particular sentence, and that "those types of arrangements are handled by the prosecutor and the defense attorney." Agent Sparks testified that he did not, in any way, hold himself out as having any authority to enter plea negotiations with Cowan. Nonetheless, Cowan invited the agents back for further interviews. During the April 12 interview, when Cowan reiterated his statement that he would only accept responsibility for the murder if he was guaranteed a sentence between one and ten years, Agent Sparks again told him that he did not have the authority to make any guarantee. Given Agent Sparks' responses each time Cowan tried to discuss a possible "deal," any subjective belief Cowan held that the agents had authority to negotiate a plea bargain was unreasonable.

Presumably aware that Federal Rule of Criminal Procedure 11(e)(6)(D) and Federal Rule of Evidence 410(3) apply only to plea negotiations with a prosecutor, or with someone with his express

10

authority, Cowan urges that we extend Porter"to include situations where law enforcement officers initiate plea negotiations with a suspect for the sole purpose of eliciting incriminating statements from the suspect." Because the agents in this case did not "initiate plea negotiations" at all, we need not address this argument.

The district court did not abuse its discretion in denying Cowan's motion to suppress.

D.

Cowan also contends that the district court erred in prohibiting Officer Milhouse from testifying about specific acts of violence by the victim, Michael Martin. Cowan argues that his claim of self-defense made this testimony relevant.

The district court ruled that, in attempting to establish Martin's violent character, the defense could introduce opinion and reputation evidence but could not introduce evidence of specific violent acts. Again, we review the district court's evidentiary ruling for abuse of discretion. Heater, 63 F.3d at 320.

The federal rules of evidence permit "[e]vidence of a pertinent trait of character of the victim of the crime [to be] offered by an accused." Fed. R. Evid. 404(a)(2). Generally, "proof [of character] may be made by testimony as to reputation or by testimony in the form of an opinion." Fed. R. Evid. 405(a). However, when the"character or a trait of character of a person is an essential element of a charge, claim, or defense," proof may also be made "by specific instances of that person's conduct." Fed. R. Evid. 405(b).

Cowan asserts that his victim's violent character constitutes an "essential element" of Cowan's self-defense claim. See Virginia Islands v. Carino, 631 F.2d 226, 229 (3d Cir. 1980); United States v. Burks, 470 F.2d 432, 435 (D.C. Cir. 1972). Even assuming it does, a question we need not decide here, the district court's exclusion of this evidence does not require reversal for two reasons.

First, the district court expressly found that the prejudicial impact of the specific acts evidence substantially outweighed its probative

11

value. When a court concludes the danger of unfair prejudice substantially outweighs the probative value of evidence, the court may, pursuant to Federal Rule of Evidence 403, exercise its discretion to exclude otherwise admissible evidence. See United States v. Waloke, 962 F.2d 824, 830 (8th Cir. 1992).

Second, in any event, the exclusion of the specific acts evidence was harmless beyond a reasonable doubt, because the defense presented much of this evidence to the jury via other avenues. Officer Milhouse, when testifying as to Martin's reputation, stated that Martin "was a beast while he was on the street," and that "[h]e was a bad boy." Moreover, because the prosecutor asked Officer Milhouse if he knew "that the crimes for which [Martin] was convicted are what put him in Lorton," the district court found that the government had "opened the door" to the crimes for which Martin had been incarcerated at Lorton, and admitted evidence of Martin's criminal record. Thus, the reputation testimony Officer Milhouse presented, in addition to the evidence of Martin's criminal record, provided the jury with significant evidence of Martin's violent character.

III.

White advances two claims, pertaining only to his own convictions.

A.

First, he asserts that his interrogation violated his Fifth Amendment right against self-incrimination, as articulated in Miranda v. Arizona, 384 U.S. 436 (1966), and his Sixth Amendment right to counsel. Specifically, White claims that his statement to FBI agents on March 29, 1993 ("if you find blood on the knife, then it's my beef"), should have been suppressed because the officers did not provide him with an attorney despite his request for one and because he did not waive his right to remain silent by talking to the agents. The district court found that White never asked for an attorney and that he knowingly and intelligently waived his right to remain silent. We reverse such a finding only if clearly erroneous. United States v. Gordon, 895 F.2d 932, 939 (4th Cir.), cert. denied, 498 U.S. 846 (1990).

12

At the pretrial suppression hearing, White admitted that he had no problem understanding the rights read to him by the FBI agents, that he read the advice of rights form, and that he understood his rights. He also acknowledged that he had been arrested several times, and that on each occasion officers read him his rights and he understood those rights. White conceded that, on this occasion, although he understood that he had a right to remain silent and a right to have an attorney present, he nonetheless made a statement to the agents. Given these uncontested facts, White cannot now argue that his decision to speak to the officers was not made "voluntarily, knowingly, and intelligently". Miranda, 384 U.S. 444.

The test for whether a defendant intelligently waives his Miranda rights is not whether it was wise to do so, but"whether his decision was made with the full understanding that he need say nothing and that he might then consult with a lawyer if he so desired." Adams v. Aiken, 965 F.2d 1306, 1316 (4th Cir. 1992) (citation omitted), cert. denied, 508 U.S. 974 (1993). Because White has met these requirements, the district court's conclusion that he effectively waived his Fifth Amendment right against self-incrimination was not clearly erroneous.

White also argues that his statements should be suppressed because the FBI agents violated his Sixth Amendment rights by ignoring his request for an attorney. If a defendant asks to speak to an attorney during interrogation, the "interrogation must cease, and officials may not re-initiate interrogation without counsel present." Minnick v. Mississippi, 498 U.S. 146, 153 (1990). See also Savino v. Murray, 82 F.3d 593, 599 (4th Cir.), cert. denied, ___ U.S. ___, 1996 WL 400267 (1996). In this case, both agents present at the interview testified that at no time during the interview did White request the assistance of counsel. Thus, in finding that White did not ask for an attorney, the district court essentially credited the testimony of the two FBI agents over White's testimony. The district court did not clearly err in doing so.

B.

Second, White asserts the government failed to introduce sufficient evidence to sustain his conviction. In reviewing a conviction for suffi-

13

ciency of evidence, in a direct appeal, we apply a well recognized standard of review, examining whether "there is substantial evidence, taking the view most favorable to the Government," Glasser v. United States, 315 U.S. 60, 80 (1942), to "establish proof of each element" of the crime beyond a reasonable doubt. United States v. Burgos, ___ F.3d ___, ___, 1996 WL 478498 (4th Cir. 1996) (en banc).

The government's case against White included the testimony of two fellow inmates, Nathaniel Curtis and Alphonso Williams. They provided evidence that White knew about Martin's murder in advance, and even assisted in positioning the victim. Williams testified that before Cowan was transferred to the tier, White warned him several times to stay away from Martin, because"Martin [was] going to get his for what he was locked up for." Curtis stated that White had told them he could not wait until Cowan "arrived on the tier because [Cowan] was going to "get his man," Martin. He further testified that White acted friendly to Martin to "bait him in" so that Martin remained on the block and would not check himself into protective custody.

These inmates also testified that White provided the murder weapon and hid it after the fact. Curtis explained that White told him that White had given Cowan the knife used to kill Martin, that Cowan gave the knife back to White after the stabbing, and that White cleaned the blood off the knife and "put it up." Williams corroborated Curtis' statements by testifying that he saw Cowan give the bloody knife to White, who did not seem surprised to get it. Williams later saw White take the knife to the back of his cell, where a sink was located.

In addition, FBI Agent Sparks testified that White told him that if they found blood on the knife retrieved from his cell, then it was his "beef," which Agent Sparks interpreted to mean that he was responsible for the crime. The government also presented other testimony that the murder weapon was White's distinctive weapon. Curtis testified that he observed White at least seven times with a sharpened butter knife. He stated that he saw a lot of shanks in prison, but none like White's sharpened butter knife, which he identified in court. Correctional Officer Paolo Rodriguez also identified the sharpened butter

14

knife as the knife he found in the mattress in White's cell, in response to a tip from Williams.

The DNA unit of the FBI laboratory subsequently analyzed a dried blood stain found on the handle of the knife that Officer Rodriguez recovered. Analysis revealed that the blood was consistent with the blood of the murder victim, Martin. Dr. Germaniuk, an expert witness and Deputy Chief Medical Examiner for the District of Columbia, testified that, based on the autopsy report, a weapon consistent with the knife recovered from White's cell caused Martin's wounds.

This evidence was sufficient to prove beyond a reasonable doubt that White participated in the murder.

IV.

Both Cowan and White argue that the district court denied them the right to meaningful voir dire and the proper number of peremptory challenges.

A.

They assert that the district court erred in refusing to send their proffered questionnaire to the jury venire prior to the trial, and in failing to ask many of the questions contained in the questionnaire during voir dire.

A trial court has broad discretion in conducting voir dire, and we may reverse based on an asserted error in voir dire only if we find that the trial court abused that discretion. See Ham v. South Carolina, 409 U.S. 524, 528 (1973). "A voir dire that has the effect of impairing a defendant's ability to exercise intelligently his challenges, whether for cause or peremptory, is a ground for reversal, irrespective of prejudice." United States v. Evans, 917 F.2d 800, 807 (4th Cir. 1990). See also Sasaki v. Class, ___ F.3d ___, ___, 1996 WL 45095, at *5 (4th Cir. 1996).

In this case, Cowan and White each submitted to the district court a list of proposed questions for the jury venire. The district court

15

asked some of their questions precisely as submitted, and asked a number of other questions covering the same topics as questions they had submitted. At a bench conference at the conclusion of the court's voir dire, Cowan's counsel stated "I think Your Honor has covered the other questions, thank you." The district court then asked, "Anything else?" and received no response from either defense attorney. Accordingly, appellants have failed to preserve for appellate review any complaint about the voir dire.

Even if they had preserved their argument, it is meritless. Appellants' claim focuses on the precise form of the questions the district court asked rather than the court's failure to question the venire about a particular subject of significance to the case. A trial court is not required to ask questions in any particular form or to ask any particular number of questions on a subject simply because a defendant asks for them. See Ham, 409 U.S. at 527; United States v. Jones, 608 F.2d 1004, 1007 (4th Cir. 1979) (trial court has broad discretion in conducting voir dire, particularly in phrasing the questions to be asked), cert. denied, 444 U.S. 1086 (1980). The questions the district court asked the jury adequately covered the topics suggested by appellants' proposed questionnaire, and elicited enough information to allow appellants to exercise their challenges intelligently. The court acted within its discretion in conducting voir dire as it did.

B.

Finally, appellants argue that the district court erred in failing to provide each of them with twenty peremptory challenges. Federal Rule of Criminal Procedure 24(b) provides:

> If the offense charged is punishable by death, each side is entitled to 20 peremptory challenges. If the offense charged is punishable by imprisonment for more than one year, the government is entitled to 6 peremptory challenges and the defendant or defendants jointly to 10 peremptory challenges. If the offense charged is punishable by imprisonment for not more than one year or by fine or both, each side is entitled to 3 peremptory challenges. If there is more than one defendant, the court may allow the defendants additional peremp-

16

> tory challenges and permit them to be exercised separately
> or jointly.

Fed. R. Crim. P. 24(b) (emphasis added). Cowan and White assert that because they were tried together, the trial involved three "sides," and that the rule entitled each of these three sides to twenty peremptory challenges. Appellants' argument is without merit.

First, we have found no cases interpreting Rule 24(b) as appellants suggest. Indeed, the Advisory Committee Notes on Rule 24(b) make plain that courts should treat joint defendants as one party for purposes of allocating peremptory challenges. The Advisory Committee Notes state:

> In capital cases the number of challenges is equalized as between the defendant and the United States so that both sides have 20 challenges, which only the defendant has at present. While continuing the existing rule that multiple defendants are deemed a single party [e.g. "side"] for purposes of challenges, the rule vests in the court discretion to allow additional peremptory challenges and to permit such changes to be exercised separately or jointly.

Fed. R. Crim. P. 24 advisory committee's note. Because the Advisory Committee Notes are instructive on the drafters' intent in promulgating the federal rules, see Williams v. United States, ___ U.S. ___, 114 S. Ct. 2431, 2442 (1994) (Kennedy, J., concurring) (listing cases taking Advisory Committee Notes as authoritative evidence of intent), we conclude that multiple defendants in capital cases must exercise their peremptory challenges jointly, as a single party.

Moreover, the discretion given to the trial court to allow additional peremptory challenges to multiple defendants in capital, felony, and misdemeanor cases further implies that multiple defendants have no right to additional challenges. See, e.g., United States v. Cochran, 955 F.2d 1116, 1121 (7th Cir.) (no abuse of discretion in refusing to grant more than ten joint peremptory challenges to defendants in five-defendant drug case), cert. denied, 506 U.S. 972 (1992); United States v. Meredith, 824 F.2d 1418, 1423 (4th Cir.) (no abuse of discretion in refusing to grant more than total of ten statutorily required peremp-

17

tory challenges in trial of seven defendants, even though trial court originally agreed to grant extra challenges), cert. denied, 484 U.S. 969 (1987), and cert. denied, 485 U.S. 991 (1988); United States v. Vallez, 653 F.2d 403, 405 (9th Cir.) (since government did not seek death penalty, three defendants tried jointly in murder case were not entitled to total of twenty challenges), cert. denied, 454 U.S. 904 (1981). Accordingly, appellants were not deprived of any statutorily required peremptory challenges.**4**

V.

For all of the above stated reasons, appellants' convictions are

AFFIRMED.

_____

**4** Even if appellants' reading of Rule 24(b) was correct, which it is not, appellants would not be entitled to the benefits of the rule because it applies to capital cases and appellants were not subject to the death penalty. Although the government does not raise this argument in its brief, the Federal Death Penalty Act of 1994, 18 U.S.C.§ 3591 (1994), which established constitutional procedures for implementing the death penalty for federal murders, was not effective when Cowan and White murdered Martin in 1993. Consequently, Cowan and White were not subject to the death penalty. Defendants not subject to the death penalty are not entitled to twenty peremptory challenges under Rule 24(b). See, e.g., United States v. Goseyun, 789 F.2d 1386, 1387 (9th Cir. 1986) (defendant not entitled to twenty challenges in § 1111 case after judicial invalidation of death penalty); United States v. Martinez, 536 F.2d 886, 890 (9th Cir. 1976) (where death penalty was not sought in federal murder case, the case is no longer a capital case requiring twenty peremptory challenges under Rule 24(b)); United States v. Vallez, 653 F.2d at 406 (even though defendants were charged with first degree murder, they were not entitled to twenty peremptory challenges where government agreed not to seek death penalty). Here, the district court provided defendants with twenty challenges where the statute entitled them only to ten.