**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 08-1270**

SUSAN J. KEESHAN, MD,

            Plaintiff - Appellant,

      v.

EAU CLAIRE COOPERATIVE HEALTH CENTERS, INC; STUART A. HAMILTON, MD; DEBORAH DAVIS, MD,

            Defendants - Appellees.

Appeal from the United States District Court for the District of South Carolina, at Columbia.  Margaret B. Seymour, District Judge.  (3:05-cv-03601-MBS)

Argued:  January 26, 2010          Decided:  September 14, 2010

Before WILKINSON, NIEMEYER, and MICHAEL, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Aaron J. Kozloski, CAPITOL COUNSEL, LLC, Columbia, South Carolina, for Appellant.  Kathryn Thomas, GIGNILLIAT, SAVITZ & BETTIS, Columbia, South Carolina, for Appellees.  **ON BRIEF:** Christina M. Summer, GIGNILLIAT, SAVITZ & BETTIS, Columbia, South Carolina, for Appellees.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Dr. Susan Keeshan, a physician who is Jewish and of Hispanic descent, sued her former employer, Eau Claire Cooperative Health Centers, Inc. (the Cooperative), alleging under Title VII that she was terminated in retaliation for filing a complaint claiming that her supervisors discriminated against her because she is not black. Keeshan also brought claims under state law for wrongful discharge and nonpayment of wages. The district court granted summary judgment to the Cooperative on the wrongful discharge claim. After a trial the jury found for the Cooperative on the Title VII retaliation and South Carolina Payment of Wages Act claims. Keeshan appeals, challenging the district court's (1) grant of summary judgment on the wrongful discharge claim, (2) ruling that required Keeshan to disclose her post-termination income on cross-examination, (3) denial of Keeshan's motion for a new trial, and (4) imposition of costs on Keeshan as the losing party. We affirm.

I.

A.

Keeshan is an obstetrician/gynecologist (OB-GYN) who was employed by the Cooperative in Columbia, South Carolina, from July 2000 until July 2004. Her employment with the Cooperative was part of a medical school scholarship she

2

received from the National Health Service Corps (NHSC). The scholarship required Keeshan to spend four years after her residency at an NHSC-approved site that provides medical services to traditionally underserved populations. The Cooperative's director, Dr. Stuart Hamilton, also an NHSC scholar, started the Cooperative in 1981 to treat low-income residents of the Eau Claire community in Columbia, South Carolina. With the help of charitable donations and federal funding, the Cooperative expanded over the next twenty years to include nine facilities, including an OB-GYN practice that opened in 1997. Hamilton interviewed Keeshan in early 2000 and hired her as a physician in the Cooperative's OB-GYN practice. The Cooperative was the only NHSC-approved site in Columbia, where Keeshan hoped to work so she could be with her husband. Although aware that Keeshan was at the Cooperative under her scholarship obligation, Hamilton considered it a possibility that she would remain after completing the four-year NHSC requirement. Soon after Keeshan started, the only other OB-GYN left the Cooperative, making Keeshan the sole physician and leader of the OB-GYN practice. The Cooperative eventually hired two other OB-GYNs during Keeshan's four-year period of employment.

While negotiating the terms of her employment contract, Keeshan informed Hamilton that she was Jewish.

3

Hamilton responded that the Cooperative would give her Yom Kippur, Rosh Hashanah, and the first day of Passover as holidays. As for delineating the duration of her employment, Keeshan's contract provided that the "term of this Agreement shall be for one year from the date [Keeshan] begins employment and shall be automatically renewed for successive one-year terms unless terminated as hereinafter provided." S.A. 97. The occurrences that could trigger termination of the contract included: (1) "By notice in writing to the other party given one hundred and twenty (120) days prior to the date of termination"; (2) "Material breach of contract by [Keeshan] or [the Cooperative]"; (3) "Death or total disability of [Keeshan]"; (4) "[Keeshan] conducting [herself] in an unprofessional, unethical or fraudulent manner"; and (5) "Financial exigency as verified by an independent party or financial review." S.A. 98. If any of these occurrences transpired, Keeshan was entitled to unpaid compensation and benefits accrued as of the termination date. Keeshan's annual salary started at $150,000 and increased to $160,000, $165,000, and $175,000 during her last three years at the Cooperative.

Keeshan's employment with the Cooperative proceeded fairly smoothly for the first couple of years. Hamilton recalled at trial that conflict first arose between Keeshan and the Cooperative over her appointment scheduling and billing

4

documentation. The Cooperative could not discern which appointments and bills were Keeshan's. Additionally, Hamilton learned that Keeshan was performing artificial inseminations for homosexual couples, which Hamilton considered inappropriate in light of the Cooperative's federal funding. Nonetheless, Hamilton gave Keeshan favorable evaluations from 2000 to 2003.

Keeshan's tension with Hamilton escalated in 2003. In May 2003 Keeshan requested time off for elective surgery. Following a meeting in which Hamilton asked Keeshan to reschedule her surgery due to another physician's absence, Keeshan sent Hamilton an email saying that she found his request insensitive and inappropriately presented in front of other staff. Hamilton found Keeshan's email inappropriate, primarily due to Keeshan's use of the phrase "rip me a new one" to describe Hamilton's behavior during the meeting. J.A. 136, S.A. 101. Hamilton deemed the email "sexually explicit," sarcastic, and insulting. J.A. 136. He testified that he decided at that moment that he would allow Keeshan to serve the time remaining on the four years required by her scholarship, but that he would not keep her on after July 2004. Keeshan apologized for the email and thought that her professional relationship with Hamilton was partially restored. Hamilton, however, filed a corrective action form regarding the email.

5

Conflict resumed when the Cooperative hired another OB-GYN, Dr. Deborah Davis, with whom Keeshan did not get along. Davis, who is African American, became the Interim Director of Women's Health and assumed Keeshan's administrative responsibilities. This did not cause Keeshan's salary or benefits to decrease. Keeshan felt that Davis took every opportunity to blame and demean her. In particular, Keeshan took offense to Davis's omission of the title "Doctor" when referring to Keeshan and to Davis's practice of calling other African Americans "brothers" and "sisters." J.A. 40.

In February 2004 Hamilton gave Keeshan two written warnings within three days of each other. One was for an unauthorized on-call arrangement that Keeshan entered into with another physician without Davis's approval. The other was for Keeshan's name appearing at the bottom of an open letter to patients urging them to contact their legislators to support tort reform. The letter appeared in South Carolina's State newspaper and declared that OB-GYNs were faced with the prospect of being unable "to continue to deliver babies" due to increased liability premiums. S.A. 104. The Cooperative's written warning to Keeshan called the letter "needlessly misleading," alarming to patients, and "in stark contrast to the Cooperative's stated mission of providing care to all patients, regardless of their economic status." S.A. 108. The

6

Cooperative reprimanded its other OB-GYNs who signed this letter, including Davis. Before issuing the warning to Keeshan, Hamilton tried to call her at home to persuade her to call the newspaper and request removal of her name. Hamilton was unable to reach Keeshan, but he received an email containing unsolicited legal advice from Keeshan's husband, Aaron Kozloski, a lawyer. Hamilton testified that Kozloski sent him unsolicited legal advice on multiple occasions.

Keeshan filed formal grievances with the Cooperative after receiving these two warnings. The grievances protested the warnings and Davis's unprofessional conduct generally. The Cooperative's grievance committee set a grievance hearing for February 20, 2004, but Keeshan did not receive notice of the hearing because it was placed in her mailbox on her day off. She received a call from a committee member on the day of the hearing, but she was in a meeting that she could not leave. No mention was made of rescheduling the hearing, which took place without Keeshan. The grievance committee concluded that Keeshan's complaints regarding her written warnings lacked merit. The committee did, however, in response to Keeshan's complaints about Davis, decide that the Cooperative should circulate a memorandum to its employees on professional conduct and courtesy.

7

On February 23, 2004, Keeshan wrote Hamilton a memorandum requesting $127,500 in productivity bonuses that she claimed to be owed under her contract. On the same day, Keeshan also filed a discrimination complaint with the Cooperative's human resources department, alleging that the Cooperative and Davis subjected her to a hostile work environment on account of her religion and race. Although she mentioned both racial and religious discrimination, the bulk of her complaint alleged that Davis, with Hamilton's consent, subjected Keeshan to unfair treatment solely because Keeshan is not black.[1] Her complaint requested that Davis be immediately terminated and that Keeshan be restored to her original position as Director of Women's Health. Hamilton testified that this complaint was the first time he learned of Keeshan's Hispanic descent.

Two days after receiving Keeshan's request for productivity bonuses and her discrimination complaint, Hamilton

[1] During a colloquy with court at the close of trial, Keeshan's counsel maintained that Keeshan never pursued a religious discrimination complaint in her pleadings and that the issue of her religion was "water under the bridge." J.A. 303. The Title VII heading of Keeshan's supplemental complaint refers only to racial discrimination. But in the factual allegations she refers to the "racial and religious discrimination grievance" that she submitted to the Cooperative. J.A. 29. Because her Title VII retaliation claim was based on this grievance that alleged discrimination on both grounds, the court instructed the jury that it could find unlawful retaliation based on Keeshan's complaint of "race and/or religious discrimination." J.A. 363.

talked with her at a board meeting. He inquired about her plans to attend law school and discussed whether they could agree on some changes that would make her happy. The next day Hamilton gave Keeshan a proposed agreement. Noting that Keeshan's "service obligation to [NHSC] ends in four short months" and that it "is important to finish any task well," Hamilton offered to (1) meet personally with the staff in the OB-GYN division to "reduce the level of tension that has arisen there;" (2) reassign Keeshan to a different Cooperative office as the sole OB-GYN for the remainder of her NHSC term; (3) remove the warning letter regarding Keeshan's unauthorized on-call arrangement from her personnel file; (4) allow a family practice resident to rotate through Keeshan's new office; and (5) "discuss[] in good faith" the prospect of Keeshan's employment with the Cooperative beyond her NHSC obligation, "assuming all aspects of this agreement are in effect." S.A. 167-68. Hamilton proposed that, in return, Keeshan rescind her grievances against the Cooperative, demonstrate a willingness to engage in "constructive personal dialogue" on her various areas of conflict with the Cooperative, and that Keeshan's husband cease communication with the Cooperative. S.A. 168. Keeshan objected to the proposed relocation and did not accept the agreement. Hamilton gave Keeshan a revised agreement without the relocation proposal. Unsatisfied with the proposed term that

9

her husband cease communication with the Cooperative, Keeshan rejected the revised agreement. The Cooperative then gave Keeshan 120 days' notice that her contract would not be renewed after July 2004.

In May 2004 Keeshan filed a discrimination and retaliation complaint with the EEOC. The complaint was transferred to the South Carolina Human Affairs Commission, and Keeshan received a right to sue letter in October 2004. Keeshan sued the Cooperative in South Carolina state court. After she amended her complaint to include federal claims, the case was removed to federal court in the District of South Carolina. Keeshan's claims included a racial discrimination claim under Title VI and Title VII, a retaliation claim under Title VI and VII, and claims under state law for wrongful discharge and unpaid wages. The district court granted summary judgment to the Cooperative on Keeshan's Title VI claims, Title VII discrimination claim, and wrongful discharge claim. Keeshan's Title VII retaliation claim and her unpaid wages claim proceeded to a jury trial in February 2008.

### B.

Over objection from Keeshan's counsel, the jury heard Keeshan testify on cross-examination about her income after leaving the Cooperative. Keeshan said that her yearly income in 2007 was $300,000. Keeshan's counsel argued that her income

10

after 2005 was irrelevant because she was not seeking back pay for any period after that year. The Cooperative's counsel responded that her current income was relevant in that it "show[ed] that she is much better off today than if she had stayed where she was." J.A. 276. Moreover, the Cooperative's counsel maintained that Keeshan's current salary was relevant to her request for punitive damages. The court was persuaded by the last point and ruled that the 2007 salary testimony was admissible if Keeshan sought punitive damages. At the close of trial, the court ultimately found insufficient evidence of malicious or reckless conduct by the Cooperative to warrant a punitive damages instruction to the jury. The jury found for the Cooperative on both the retaliation and unpaid wages claims.

Keeshan moved for a new trial on the grounds that the jury was unduly prejudiced after learning of her $300,000 salary. In support of her motion, she submitted an affidavit swearing that she heard "gasps from the jury box" and that she could tell from the astonished looks on jurors' faces that they had already decided against her. J.A. 373-74. The court denied Keeshan's motion and taxed Keeshan with costs as the losing party. Keeshan appeals, asking this court to (1) reverse the grant of summary judgment to the Cooperative on her wrongful discharge claim, (2) hold that she is entitled to a new trial on the grounds that her post-termination income was erroneously

11

admitted into evidence, and (3) hold that even if she remains the losing party, she should not be taxed with the Cooperative's costs.

## II.

### A.

We first address the district court's grant of summary judgment to the Cooperative on Keeshan's state law wrongful discharge claim. Keeshan maintains that she was wrongfully discharged in retaliation for asserting her right to unpaid wages under South Carolina's Payment of Wages Act, for exercising her civil rights, and for refusing to aid the unlicensed practice of medicine and insurance fraud. This wrongful discharge claim is based on South Carolina's public policy exception to the employment at-will doctrine. The exception permits a cause of action "where the retaliatory discharge of an at-will employee constitutes violation of a clear mandate of public policy." Ludwick v. This Minute of Carolina, Inc., 337 S.E.2d 213, 225 (S.C. 1985). The exception applies to at-will employees' claims of retaliatory termination for invoking their rights under the Payment of Wages Act. Evans v. Taylor Made Sandwich Co., 522 S.E.2d 350, 354 (S.C. Ct. App. 1999).

The district court held that Keeshan could not avail herself of the public policy exception because she was not an

12

at-will employee of the Cooperative. The court rejected Keeshan's comparison of her contract to that in Stiles v. American General Life Insurance Co., 516 S.E.2d 449, 451 (S.C. 1999), in which the South Carolina Supreme Court found the durational terms of an employment contract so indefinite that the employee was essentially at-will. The contract allowed either party to terminate the employment relationship "for any reason" upon thirty days' written notice. Id. at 450. The supreme court reasoned that the notice provision was so unrestricted that it left the employee "in the same position as an at-will employee with the only difference being that the employer is required to give the employee notice prior to terminating employment." Id. at 451.

We agree with the district court that Keeshan failed to raise a material factual dispute over whether she was an at-will employee. The automatic renewal provision indicates that the contract would continue from year to year absent one of the specified termination-triggering occurrences. The notice provision, if invoked, had to be invoked at least 120 days prior to the end of a one-year term. This durational restriction distinguishes Keeshan's contract from the completely unfettered contract in Stiles. The contract in Stiles contained no definite durational term, whereas Keeshan's contract provided that it would remain in effect "for one year from the date

13

[Keeshan] begins employment and shall be <u>automatically renewed</u> for successive one year terms." S.A. 97 (emphases added).

Although Keeshan's contract contained a 120-day notice provision that could be invoked by either party, her contract had more constraints than the contract in <u>Stiles</u>. Because Keeshan started at the Cooperative on July 17, 2000, the one-year terms ran from July 17 of one year to July 17 of the next. When Keeshan refused to accept Hamilton's revised agreement by March 5, 2004, the Cooperative gave her 120 days' notice that her employment would not continue after she completed the last one-year term of her four-year scholarship requirement. March 5 was the first day of the 120-day notice period. Keeshan's employment with the Cooperative ended on July 17, 2004, 132 days later. If the Cooperative had tried to give Keeshan 120 days' notice on, say, March 30 instead of March 5, this would have violated the contract because there would be fewer than 120 days remaining on the term. Keeshan's contract was therefore unlike the contract in <u>Stiles</u>, which did not have a durational term constraining the parties' ability to invoke the notice provision. Indeed, Keeshan herself interpreted the notice provision as protecting her from having at-will status. She testified that during her discussion with Hamilton over his proposed resolution of her complaints, she explained that she

14

was "not going to waive [her] 120 day notification. Otherwise [she] would be an at-will employee." S.A. 74.

Further, the other termination-triggering events listed in the contract (death, total disability, material breach, unprofessional conduct, and financial exigency) suggest that unlike the parties in Stiles, neither Keeshan nor the Cooperative had unbounded discretion to end the employment relationship. Keeshan was not an "otherwise at-will employee," with the "only difference" being that the Cooperative had to give her 120 days' notice of termination. Stiles, 516 S.E.2d at 450-51 (emphasis added). Her contract contained a durational term of one year and limited the time period during which the parties could invoke the notice provision.

B.

We now turn to Keeshan's argument that her compelled cross-examination testimony on her income after leaving the Cooperative was irrelevant and prejudiced the jury to decide against her. "A trial court possesses broad discretion in ruling on the admissibility of evidence, and we will not overturn an evidentiary ruling absent an abuse of discretion." United States v. Hedgepeth, 418 F.3d 411, 418-19 (4th Cir. 2005). An "abuse of discretion occurs only when a trial court has acted arbitrarily or irrationally in admitting evidence, when a court has failed to consider judicially recognized facts

15

constraining its exercise of discretion, or when it has relied on erroneous factual or legal premises." Id. at 419 (internal citations and quotations omitted). "If an evidentiary ruling is found to be erroneous, we then review the error for harmlessness." Id. (internal citations and quotations omitted). To conclude that the district court's evidentiary errors were harmless, "we need only be able to say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." United States v. Heater, 63 F.3d 311, 325 (4th Cir. 1995) (internal citations and quotations omitted).

We agree with Keeshan that the district court's admission of her testimony on her post-termination income was based on an erroneous legal premise and was therefore an abuse of discretion. The court found the testimony relevant to Keeshan's request for punitive damages, which she sought under her Title VII retaliation claim. Title VII permits recovery of punitive damages from private employers "if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. 1981a(b)(1). This standard requires the plaintiff to show that the employer

16

"discriminate[d] in the face of a perceived risk that its actions will violate federal law." Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 536 (1999). It is axiomatic that the purpose of punitive damages is to punish and deter defendants. "Most often . . . eligibility for punitive awards is characterized in terms of a defendant's motive or intent." Id. at 538 (emphasis added). That Keeshan's salary nearly doubled after leaving the Cooperative may indicate that Keeshan was better off in another job. But her improved financial status is irrelevant to her contention that the Cooperative terminated her with malice or reckless indifference to her right under Title VII to bring a racial and religious discrimination complaint.

Yet we are satisfied that this error was harmless. After reviewing the record, we can say with more than "fair assurance" that the jury was not "substantially swayed" by the revelation of Keeshan's higher salary to render a verdict for the Cooperative. Heater, 63 F.3d at 325. After the court declined to send a punitive damages instruction to the jury, Keeshan's counsel did not proffer a limiting instruction that Keeshan's subsequent income was irrelevant to her claims. The district court correctly instructed the jury on what Keeshan had to show to prevail on her Title VII retaliation claim, and her Wages Act claim. The court also instructed the jury to follow

17

the law as stated by the court and not to decide based on personal dislikes or prejudices.

Without "stripping the erroneous action from the whole," Heater, 63 F.3d at 325, the record supports the jury's findings for the Cooperative. A Title VII retaliation claim requires a plaintiff to prove that (1) she engaged in protected activity, (2) an adverse employment action was taken against her, and (3) a causal connection between the protected activity and the adverse action. Holland v. Wash. Homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007). Keeshan would have to show that the Cooperative did not renew her contract "because [she] engaged in a protected activity" by complaining about discrimination. Id. (emphasis in original) (internal citations and quotations omitted). If a plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a "legitimate nonretaliatory reason for its actions." Id. (internal citations and quotations omitted).

The record comes up far short for Keeshan on the third element of a prima facie retaliation claim: the causal connection between the adverse action and the protected activity. Keeshan's problems at the Cooperative started long before she filed her discrimination complaint. Hamilton testified that problems started as early as 2002 over Keeshan's billing and appointment scheduling discrepancies. And Keeshan

18

sent the email to which Hamilton took offense in May 2003, nearly a year before she filed her discrimination complaint. Keeshan even referred to her "widening rift" with Hamilton in the email. S.A. 102. The jury could therefore find that Keeshan showed no causal connection between the complaint and the nonrenewal of her contract.

Even if Keeshan could establish a prima facie case, the record supports the conclusion that the Cooperative terminated her for a legitimate, nonretaliatory reason: her interpersonal conflicts with Davis and Hamilton and her contribution to a friction-laden atmosphere in the OB-GYN division starting in 2003. It is clear that there was seldom a meeting of the minds between Keeshan, Hamilton, and Davis when it came to professional matters. It was up to the jury to determine whether the Cooperative terminated Keeshan in retaliation for her discrimination complaint. The record gives us "fair assurance" that the disclosure of Keeshan's higher salary upon leaving the Cooperative did not prejudice the jury to ignore or discount a causal connection between the discrimination complaint and the termination, or to find a legitimate nonretaliatory reason where none existed. Heater, 63 F.3d at 325. The abundant evidence of Keeshan's tension-fraught relationship with Hamilton and Davis persuades us that the jury decided against her based on the law, not her subsequent higher

19

salary.  We note that Keeshan's salary at the Cooperative was not paltry, so we are not convinced that after learning that she continued to earn more than most Americans,[2] the jury decided to ignore Title VII law.

There is more room for prejudicial effect on Keeshan's Payment of Wages Act claim.  This claim was based on Keeshan's contention that the Cooperative unlawfully withheld "productivity bonuses" that she was owed under her contract. Her contract provided that if her base salary was less than forty percent of her "net production (collected fees)" she would "receive a settlement in an amount equal to the difference between the base salary and such sum."  S.A. 95.  Keeshan's testimony on her subsequent salary put her in the position of arguing that although she enjoyed a considerable income, she was entitled to an additional $127,500 in productivity bonuses. However, we are satisfied that the jury based its finding for the Cooperative on both sides' presentation of the numbers during the period of Keeshan's employment with the Cooperative, not on her later income.

---

[2] The medium household income for the United States in 2002-2004 was $44,473.  The medium household income for South Carolinians during this period was $39,326.  U.S. Census Bureau, Three-Year Medium Household Income by State, 2002-2004, available                                                                 at http://www.census.gov/hhes/www/income/income04/statemhi.html.

20

Keeshan testified to her base salary during each year of her employment with the Cooperative. At the request of the Cooperative's counsel during cross-examination and with the aid of a calculator, Keeshan multiplied her collected fees by 0.4. The numbers that Keeshan plugged in for her collected fees came from the Cooperative's answers to her interrogatory requests for the "sum of all amounts actually paid to [the Cooperative] by any person or payor for care or services rendered by Dr. Keeshan" for each year from 2000 to 2004. S.A. 200-01. When Keeshan multiplied these yearly fees by 0.4 and then compared the result to her corresponding base salary for those years, it was clear that her base salary always exceeded 40 percent of these collected fees.

Keeshan disputed the accuracy of the Cooperative's calculation of her collected fees, but she did not offer anything more accurate from which we can conclude that the jury's verdict for the Cooperative was so off-base as to indicate that it was "substantially swayed" by some resentment towards Keeshan's financial status at the time of trial. Heater, 63 F.3d at 325. Hamilton testified to how Keeshan's collected sums were calculated and explained how insurance adjustments factored in. He said that part of the difficulty in calculating Keeshan's collected sums, at least for the years 2000-2002, was because Keeshan billed nurse practitioner

21

services under Keeshan's provider number and Keeshan "set the appointment schedule such that it looked like she was seeing a large number of patients . . . but in reality, the nurse practitioner was hidden in the appointment schedule under Dr. Keeshan's name." J.A. 108. He explained that the Cooperative then had to "go and do a manual count by hand employing extra people to go through 13,000 records to sort out who was actually doing what." J.A. 109. After receiving Keeshan's memorandum requesting productivity bonuses, the Cooperative rehired a previous employee from the billing office who had assisted in separating Keeshan's billings from 2000 to 2002. We find nothing in the record to indicate that the jury accepted calculations so blatantly inaccurate that we can infer that its Wages Act verdict was tainted by Keeshan's subsequent income. Keeshan's testimony on the numbers was not overflowing with conviction. She explained that some of her figures came from "extrapolation" based on "other physicians in the community who had a similar pay mix and [were] doing similar work." J.A. 200. She kept "handwritten post-its" of the procedures she performed, which she later threw out. J.A. 266-67. The record leaves us more than fairly assured that the jury's verdict on the Wages Act claim was not substantially swayed by the erroneously admitted testimony on Keeshan's subsequent income.

22

Because there was ample evidence indicating that the verdicts were not substantially swayed by the erroneously admitted testimony, we readily conclude that the district court did not abuse its discretion by denying Keeshan's motion for a new trial. "In considering a motion for a new trial, a trial judge may weigh the evidence and consider the credibility of witnesses, and if he finds the verdict is against the clear weight of the evidence, is based on false evidence or will result in a miscarriage of justice, he must set aside the verdict, even if supported by substantial evidence, and grant a new trial." Chesapeake Paper Prods. Co. v. Stone & Webster Eng'g Corp., 51 F.3d 1229, 1237 (4th Cir. 1995) (internal citations and quotations omitted). This court will not reverse the decision "save in the most exceptional circumstances" evincing a "clear abuse of discretion." Bristol Steel & Iron Works v. Bethlehem Steel Corp., 41 F.3d 182, 186 (4th Cir. 1994) (internal citations and quotations omitted).

In support of her motion for a new trial, Keeshan submitted an affidavit swearing that she heard "gasps from the jury box" when she revealed her subsequent income, and that some jurors looked at her with open mouths and astonished eyes. J.A. 373. The Cooperative contends that this affidavit is inadmissible under Fed. R. Evid. 606(b), which provides that "evidence of any statement by the juror may not be received on a

23

matter about which the juror would be precluded from testifying," including matters "concerning the juror's mental processes in connection with" the verdict. Id. Keeshan's affidavit is more accurately characterized as Keeshan's impression of the effect of her testimony on the jury, not evidence of a juror statement. Regardless, even if the district court credited Keeshan's recollection, the court did not abuse its discretion in concluding that the clear weight of the evidence outweighed any possible prejudice from Keeshan's testimony. As explained above, the record leaves us assured that the jury correctly applied the law.

## C.

Finally, we take up Keeshan's argument that the district court should not have imposed costs on her as the losing party. As an initial matter, we reject the Cooperative's contention that this argument was not preserved for appeal because Keeshan's notice of appeal did not explicitly indicate that she was challenging the district court's imposition of costs. Federal Rule of Appellate Procedure 3(c)(1)(B) requires appellants to "designate the judgment, order, or part thereof being appealed." "We liberally construe Rule 3(c)'s requirements concerning the sufficiency of the notice of appeal to avoid technical impediments to appellate review." Spence v. Educ. Credit Mgmt. Corp. (In re Spence), 541 F.3d 538, 543 (4th

24

Cir. 2008). "[E]ven when a party files a notice of appeal that is technically at variance with the letter of a procedural rule, a court may nonetheless find that a litigant has complied with the rule if the litigant's action is the functional equivalent of what the rule requires." United States v. Little, 392 F.3d 671, 681 (4th Cir. 2004) (internal quotations omitted). "[A]n error in designating the issue appealed will not result in a loss of appeal as long as the intent to appeal a specific judgment can be fairly inferred and the appellee is not prejudiced by the mistake." Bogart v. Chapell, 396 F.3d 548, 555 (4th Cir. 2005) (internal citations and quotations omitted). "The appellant simply needs to address the merits of a particular issue in her opening brief in order to demonstrate that she had intent to appeal that issue and the appellees were not prejudiced by her mistake, inasmuch as they had notice of the issue and the opportunity to fully brief it." Id.

Keeshan's notice of appeal says that she appeals "from the final judgments and orders granting summary judgment and denying Plaintiff's Motion for New Trial." J.A. 378. The district court's imposition of costs is a final judgment and although Keeshan did not specifically designate the cost issue in her notice of appeal, she addressed the merits in her opening brief and the Cooperative responded in its brief. The Cooperative has not shown prejudice from Keeshan's lack of

25

specificity in the notice. Keeshan's costs challenge is therefore properly before this court.

As Keeshan acknowledges, her contention that costs should be awarded to prevailing Title VII defendants only in rare circumstances is contrary to the plain language of Federal Rule of Civil Procedure 54(d)(1) and the law of this circuit. Rule 54(d)(1) presumes that costs are awarded to the prevailing party: "Unless a federal statute, these rules, or a court order provides otherwise, costs – other than attorney's fees – should be allowed to the prevailing party." A district court's award of costs is reviewed for abuse of discretion. Cherry v. Champion Int'l Corp., 186 F.3d 442, 446 (4th Cir. 1999). However, Rule 54(d)(1) places some restraint on this discretion by indicating when costs should not be awarded to prevailing parties as a matter of course, such as when a statute or a court order provides otherwise. In Cherry we held that when a statute or federal rule of civil procedure does not shift costs to the prevailing party, a court may not do so except in rare circumstances including: "misconduct by the prevailing party worthy of a penalty"; "the losing party's inability to pay"; the "excessiveness [of the costs] in a particular case"; "the "limited value of the prevailing party's victory"; or "the closeness and difficulty of the issues decided." Id.

The Supreme Court has held that Title VII cabins courts' discretion to award attorneys' fees to prevailing defendants, but the Court has not held the same with regard to costs. A prevailing Title VII defendant should not be awarded attorneys' fees from the losing plaintiff unless the court finds that the plaintiff's claim was "frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate it after it clearly became so." Christiansburg Garment Co. v. Equal Employment Opportunity Comm'n, 434 U.S. 412, 422 (1978).

Most circuits, including this one, have rejected the argument that an unsuccessful Title VII plaintiff's good faith in bringing the suit will likewise shield her from being taxed with her opponent's costs. "[G]ood faith, standing alone, is an insufficient basis for refusing to assess costs against [the losing] party." Cherry, 186 F.3d at 446; see also Pacheco v. Mineta, 448 F.3d 783, 794 (5th Cir. 2006) ("Every circuit to expressly address the question in a published opinion – the Fourth, Sixth, Seventh, Ninth and Tenth – has ruled that good faith, by itself, cannot defeat the operation of Rule 54(d)(1)."); Cosgrove v. Sears, Roebuck, & Co., 191 F.3d 98, 101 (2d Cir. 1999) ("We see no reason . . . to apply the same type of heightened [Christiansburg] standard to the assessment of costs.").

Keeshan contends that there is no reason to distinguish between costs and attorneys' fees under Title VII. She therefore urges us to reverse Cherry and extend Christiansburg's bad faith standard to costs. This panel cannot overrule the decision of a prior panel. United States v. Collins, 415 F.3d 304, 311 (4th Cir. 2005). Moreover, we disagree that there is no reason to distinguish between costs and attorneys' fees for unsuccessful Title VII plaintiffs who litigated in good faith. Christiansburg's bad-faith standard was grounded in the rationale that if unsuccessful Title VII plaintiffs were taxed with defendants' attorneys' fees, this "would undercut the efforts of Congress to promote the vigorous enforcement of the provisions of Title VII." 434 U.S. at 422. The same deterrent rationale does not necessarily hold true for costs, which are typically much less than attorneys' fees.[3] See Poe v. John Deere Co., 695 F.2d 1103, 1108 (8th Cir. 1982) ("Congress has not . . . carved out an exception to Rule 54(d) relieving a losing civil rights litigant of the burden of bearing the costs of litigation. The rationale for this distinction is clear. Whereas the magnitude and unpredictability of attorney's fees would deter parties with

---

[3] The district court taxed Keeshan with costs in the amount of $ 2823.05. It is safe to assume that this sum is far less than the Cooperative's attorneys' fees.

28

meritorious claims from litigation, the costs of suit in the traditional sense are predictable and, compared to the costs of attorneys' fees, small."). And, as the Seventh Circuit has observed, "[i]f the awarding of costs could be thwarted every time the unsuccessful party is a normal, average party and not a knave, Rule 54(d) would have little substance remaining." Popeil Bros. v. Schick Elec., Inc., 516 F.2d 772, 776 (7th Cir. 1975). The district court thus acted well within its discretion by taxing Keeshan with the Cooperative's costs.

The district court also properly taxed Keeshan with costs on her Payment of Wages Act claim because the Cooperative was the prevailing party. If an employer is found liable under the Wages Act, "the employee may recover in a civil action an amount equal to three times the full amount of the unpaid wages, plus costs and reasonable attorney's fees." S.C. Code Ann. § 41-10-80(C). The statute allows prevailing plaintiffs to recover treble damages, costs, and attorneys fees, but it is silent on when losing plaintiffs may avoid the attorneys' fees and costs of their successful opponents. Therefore, Rule 54(d)(1)'s presumption of awarding costs to the prevailing party applies.

III.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.